495 P.2d 470

**STATE of Arizona, Appellee,**

v.

**Sterling C. CORLEY, Appellant.**

**No. 2236.**

Supreme Court of Arizona,
In Banc.

April 7, 1972.

Rehearing Denied July 11, 1972.

Gary K. Nelson, Atty. Gen., Frank Sagarino, Chief Asst. Atty. Gen., Mary Chandler, Asst. Atty. Gen., Phoenix, for appellee.

Mangum, Wall & Stoops, by Daniel J. Stoops, Flagstaff, for appellant.

LOCKWOOD, Justice:

Dr. Sterling C. Corley was formally charged with first degree murder. He pled guilty to second degree murder and raised the issue of insanity. Pursuant to A.R.S. § 13–1621.01, this issue was tried to a jury. The jury was unable to reach a verdict, and a mistrial was declared. A second trial was had subsequent to this Court's decision of State v. Shaw, 106 Ariz. 103, 471 P.2d 715 (1970), cert. denied 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971), which invalidated the bifurcated trial provision of § 13–1621.01, supra. The defendant before the second trial pled not guilty and not guilty by reason of insanity to an amended information charging second degree murder. The jury returned a verdict of guilty of murder in the second degree. He was sentenced to 20 to 40 years imprisonment.

On June 24, 1969, defendant purchased a full box of .38 caliber special ammunition from Melvin Kiddie, an employee of the Western Auto Store in Bullhead City. On that same day he went to the Holiday Shores Inn to find James Stahlman, Vice-President and General Manager of Holiday Shores Development Company. Not finding him there, defendant proceeded to Stahlman's office. Tom Ryan, real estate salesman, testified that defendant entered Stahlman's office and said "God damn it, Jim you took a hundred feet of my property." He insisted that Stahlman accompany him to the property. Stahlman acquiesced and told Ryan that he would return in fifteen minutes. Ryan "never saw [Stahlman] after that time," and on June 25, 1969 Stahlman's body was found on the shore of the Colorado River.

One witness, James Pinner, a member of the Imperial County, California Sheriff's Office, stationed in Winterhaven, California, testified that he talked to the defendant in Winterhaven, at 4:00 a. m. on June 25, 1969. Pinner had noticed a "large red stain", later identified as blood, and a "2 inch revolver" in the front seat of the flatbed truck defendant was driving. Defendant Corley was interrogated by Officer Pinner at Winterhaven for two hours and then transferred to the Mohave County Sheriff's Department in Arizona and brought before the Justice of the Peace in Kingman, Arizona for arraignment.

In this appeal defendant raises six questions. First, he argues that there was insufficient evidence presented at trial to prove that he was sane beyond a reasonable doubt.

Although a defendant is presumed sane, if he raises the issue of insanity, it becomes the state's burden to prove sanity beyond a reasonable doubt. State v. Ganster, 102 Ariz. 490, 433 P.2d 620 (1967). We are of the opinion, however, that the record reveals that the state has met its burden of proof.

The witnesses, Officer Pinner, Officer Moore, Rose Moore, Lillie Callahan, Melvin Kiddie and Officer Vinson, all of whom had seen and observed defendant shortly before or after the homicide, testified that "he was able to organize his thinking", that "he appeared normal", and that he answered questions "clearly and very coherently". The Justice of the Peace, Clyde

McCune, stated that in his opinion when he arraigned defendant, the latter was sane. Lillie Callahan, who observed defendant a few hours before the homicide, said she thought he was sane at that time. Officer Moore, who was present when defendant was interrogated in Winterhaven, likewise testified the defendant appeared to be sane at that time.

■ The evidence presented at trial consisted of the testimony of both expert and lay witnesses. The rule is that a witness may testify to a defendant's sanity if his opinion is based upon personal observation or knowledge of the past conduct and history of the defendant. State v. Coey, 82 Ariz. 133, 309 P.2d 260 (1957).

Notwithstanding the fact that there was evidence of defendant's insanity consisting primarily of expert testimony, it is well settled that:

> "[t]he issue of criminal responsibility in Arizona [is] a fact question for the jury. In addition, the credibility of expert witnesses and the weight to be given expert testimony has been a jury question in this state * * * [and] a numerical advantage in a head count of witnesses and the mere fact that testimony is elicited from competent psychiatrists do not suffice to necessitate the direction of a verdict for one party or the other." State v. Ganster, supra, 102 Ariz. at 493, 433 P.2d at 623.

■ In view of all the evidence presented at trial we hold that the jury's finding of guilty was adequately supported by the evidence. See Buatte v. United States, 350 F.2d 389 (9th Cir. 1965), cert. denied, 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed. 83 (1966).

The second question raised is whether there was an inference arising out of the failure of the state to call expert medical witnesses in rebuttal to the defendant's evidence as to insanity that the defendant's evidence was true because uncontradicted; and, if there was, was defendant entitled to an instruction so stating.

Defendant quotes language from State v. Schantz, 98 Ariz. 200, 403 P.2d 521 (1965), cert. denied, 382 U.S. 1015, 86 S.Ct. 628, 15 L.Ed.2d 530 (1966), as support for his view that there is an inference and that he is entitled to a jury instruction to that effect. The pertinent language of that opinion is:

> "There is an inference arising out of the failure of the State to call expert medical witnesses in rebuttal that the defendant's evidence as to insanity is true because uncontradicted * * *." State v. Schantz, supra, 98 Ariz. at 213, 214, 403 P.2d at 530.

Defendant has merely lifted out of context a statement from that opinion and ascribed a meaning to it that was never intended by the Court. The Court by the use of this language did not mean that there was an inference as a *matter of law*.

■ Certainly an inference *may* arise in the minds of the jurors that defendant's expert evidence is true when uncontradicted, and the jury may properly find it true, but to instruct the jury that they are required to find it true as a matter of law would be an invasion of the jury's province. See Reid v. Topper, 32 Ariz. 381, 259 P. 397 (1927); Standage v. Tarpey, 8 Ariz. App. 342, 446 P.2d 246 (1968).

■ The third question raised is whether a person's knowledge that his act is "wrong," as such term is used in the "M'Naghten Test" [1] for criminal insanity, should be defined as "wrong" by defendant's personal beliefs or "wrong" as defined by a community standard of morality.

Defendant challenges the following jury instruction:

> "Knowledge that the act was wrong, as the phrase is used in these instructions,

---

1. An accused must have had at the time of the commission of the criminal act:
    (1) Such a defect of reason as not to know the nature and quality of the act, or

(2) If he did know, that he did not know he was doing what was wrong. See State v. Schantz, supra, 98 Ariz. at 207, 403 P.2d at 525.

means knowledge that the act was wrong according to generally accepted moral standards of the community and not the defendant's own individual moral standards. Knowledge that an act is forbidden by law will permit the inference of knowledge that the act is wrong according to generally accepted moral standards of the community."

It appears to be the defendant's position that this instruction eliminates consideration by the jury of the defendant's own *personal beliefs.*

No authority is cited for defendant's proposition nor have we found case law adopting it. The interpretation of the word "wrong" as used in M'Naghten has been an enigma since the standard was almost uniformly adopted. A few courts have adhered to the view that the word should be restricted to a legal sense, i. e., if the defendant was suffering from a mental disease and did not know he was violating the laws of the state when he committed his act he will be declared insane. State v. Andrews, 187 Kan. 458, 357 P.2d 739 (1961). This view has been criticized, however, because it makes ignorance of the law a defense. Wharton's Criminal Law and Proc. § 39 at 89 (1957). Most courts have adopted the position that wrong should be expanded to include both legal and moral wrong, i. e., that defendant will be declared insane if he was suffering from a mental disease and not aware at the time he committed his act that it was in violation of community standards of morality. See concurring opinion in State v. Malumphy, 105 Ariz. 200, 461 P.2d 677 (1969). We find no authority upholding the defendant's position that one suffering from a mental disease could be declared legally insane if he knew that the act was morally and legally wrong but he personally believed that act right. We believe that this would not be a sound rule, because it approaches the position of exonerating a defendant for his personal beliefs and does not take account of society's determination of defendant's capacity to conform his conduct to the

law. See generally, Perkins on Criminal Law, Ch. 8, § 2 at 850 (1969).

Defendant challenges the jury instruction on further grounds. He argues that if "wrong" is to be defined in both a moral and a legal sense the instruction is improper because it dictates that the knowledge of the legality of a particular act *controls* the moral concept of the specific act in question. We do not agree.

Examination of the instruction given leads us to conclude that the judge properly instructed the jury. The stated inference is supported by persuasive authority. Justice Cardozo stated in People v. Schmidt, 216 N.Y. 324, 110 N.E. 945 (1915):

"Knowledge that an act is forbidden by law will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals. Obedience to the law is itself a moral duty." 216 N.Y. at 340, 110 N.E. at 949.

It is important to note that the inference does not preclude the jury from finding that the defendant did not know his act was wrong according to generally accepted moral standards. It merely requires evidence to overcome the inference.

Defendant's fourth point is that the trial court failed to give the complete instruction on voluntary intoxication and criminal responsibility pursuant to A.R.S. § 13–132. The instruction given by the trial court was:

"No act committed by a person while in a state of voluntary drug or alcohol intoxication is less criminal by reason of his having been in such condition."

Counsel for the defense failed to request the additional instruction on intent, although given the opportunity to do so when the court at the close of giving instructions, asked counsel if they had any further instructions to request. Defendant strenuously argues that this additional instruction was essential. There was no specific evidence that defendant was intoxicated at

the time of the killing. One witness, Susie Mullinax, a close friend of the defendant, testified that she had been with defendant on the night previous to the killing and he was intoxicated at that time. Another witness, Lillie Callahan had seen the defendant the next morning a few hours before the killing and she testified as follows:

"Q. Could you smell any alcoholic beverages on Dr. Corley?

"A. No, I could not.

"Q. Were you very close to him?

"A. Yes, we were both leaning over the counter talking, yes."

There was testimony that defendant had a history of using alcohol and drugs to an excess, but this is too remote to support an instruction on intoxication.

■ In defendant's fifth argument, he maintains that the trial court's refusal to instruct the jury on manslaughter as requested was reversible error. The trial court did not err in refusing this instruction since there was no evidence upon which to base it.

There was testimony that when defendant went to Stahlman's office he was in an angry mood. However, there was testimony that after the quarrel defendant calmed down and when the two left they were not arguing. There is no direct evidence of what actually happened when Stahlman was shot. The evidence of anger exhibited by the defendant previous to the killing tends to prove malice necessary for second degree murder, but not provocation which would reduce second degree murder to manslaughter.

■ Defendant further asserts that because there were no eye witnesses to the killing the only means of determining the actual circumstanc es was *to force* the defendant to testify, which would violate his privilege against self-incrimination. We do not agree. First, having not testified, defendant cannot claim a violation of that constitutional privilege. Moreover, even if he had testified, the Supreme Court of the United States has stated that:

"A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him." Harrison v. United States, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047, 1051 (1968).

Defendant made a strategic decision not to testify, a voluntary act, which in no way infringed his right of privilege against self-incrimination. See also, United States v. Weber, 437 F.2d 327 (3rd Cir. 1970).

■ In his final argument defendant urges this court to promulgate a different standard than M'Naghten for determining insanity. We reaffirm our position as stated in State v. Schantz, *supra*.

"[I]f M'Naghten is to be changed the arguments should be made to the legislature rather than the courts. Whatever may be the theoretical merits in the medical evaluation of the volitional aspects of the human mind, we, * * * do not accept § 4.01 of the Model Penal Code as the test for criminal responsibility in this state." 98 Ariz. at 210–211, 403 P.2d at 528.

Judgment affirmed.

HAYS, C. J., CAMERON, V. C. J., and STRUCKMEYER and HOLOHAN, JJ., concur.