[No. 49260–3.   En Banc.   December 1, 1983.]

THE STATE OF WASHINGTON, *Respondent*, v. GARY
A. CAMERON, *Petitioner*.

*Robert C. Brungardt* and *Toni Sheldon,* for petitioner.

*Gary P. Burleson, Prosecuting Attorney,* and *L. Frank Johnson, Deputy,* for respondent.

STAFFORD, J.—Petitioner, Gary Cameron, was charged with the premeditated first degree murder of his stepmother, Marie Cameron. His principal defense was that he was insane at the time he committed the offense. The Court of Appeals affirmed a guilty verdict and this court granted Cameron's petition for review. We reverse the trial court and the Court of Appeals. In doing so, we shall discuss only those issues on which reversal is granted.

At the outset it should be noted that petitioner does not challenge the charge that he stabbed Marie Cameron numerous times or that she died as a result of those wounds. Further, there does not seem to be any serious question that, except for the defense of insanity, the stabbing was done with an intent to kill. Rather, the challenge focuses on three errors alleged to have denied him a fair trial: (1) the definition of insanity in such a way as to prevent the jury's consideration of his insanity defense; (2) the admission of foreign pubic hairs found on the victim's body; and (3) the admission of hearsay evidence of an alleged statement made by the victim 2 months prior to her murder.

I

Turning first to the insanity defense, it is clear there is evidence running counter to petitioner's contention. This, however, does not detract from petitioner's challenge to the trial court's insanity instruction. The question is whether there is evidence of insanity which the jury could have considered but for the court's instruction. We hold there is.

The basic facts reveal that on the morning of June 9, 1980, petitioner stabbed Marie Cameron in excess of 70 times, leaving the knife sticking in her heart. The body was left in the bathtub with no apparent attempt to conceal it. Later that day a police officer saw petitioner in downtown Shelton wearing only a pair of women's stretch pants, a woman's housecoat, a shirt and no shoes. He was stopped

and questioned. After first giving a false name, he corrected it and explained he was dressed that way because "I just grabbed what I could . . . My mother–in–law turned vicious." He also stated he was headed for California. Having no known reason to detain petitioner, the officer released him to continue hitchhiking.

The next day petitioner was detained by the Oregon State Police as he wandered along the shoulder of Interstate 5 near Salem. Since he was wearing only the stretch pants and one shoe he was thought to be an escapee from a nearby mental hospital. A check revealed petitioner was wanted in Shelton for the death of Marie Cameron.

Petitioner was arrested and informed of his constitutional rights. He then gave two confessions, the first being a tape–recorded oral confession and the second a signed written confession. Neither is challenged by petitioner.

In the oral confession petitioner stated generally that he was living in or about the home of his father and stepmother. He left home dressed as he was because his stepmother had become violent. "[S]he's into different types of sorcery. She's just strictly a very evil person . . . and she became very violent with me, with a knife in her hand, and so, uh, I don't deny that I'm the one that did what went on out there." He indicated that when he walked into the bathroom he had not expected her. When he saw her, she had the knife which he was able to take from her easily by bending her wrist back. Then, as he stated: "I took the knife and really stabbed her."

In describing the stabbing, petitioner related: "I just kept stabbing her and stabbing her, because she wasn't feeling . . . it was as if she was laughing . . . as if she was up to something that morning, and I don't know . . . she plays around with witchcraft and that stuff . . ." The last place he saw her was in the bathtub about which he said "she kept moving and moving and moving, and kind of grabbed me like this, but laughing, as if she was enjoying . . . and it was kind of sickening, but it was really maddening to me, because of her offense towards me, it was like . . . you

know, it was almost like she was mechanical . . . I mean, the thing was set up that, that's what she wanted to happen. . . . I feel that deep inside she was asking somebody to put her out of her misery . . . she was very symbolic with the 'Scarlet Whore Beast' she was very much into sorcery very, uh, anti–God, not really anti–God but takes the God's truth and twists it into sorcery."

Concerning his feelings about the incident petitioner said: "I felt confused . . . I felt no different from the beginning than the end there was no difference. . . . legally I know, that it is against the law, but as far as right and wrong in the eye of God, I would say I felt no particular wrong."

When asked further about the incident petitioner responded: "I washed the blood off me, and I changed clothes, and then I looked back at her and she was, uh, she was still moving around, after being stabbed, what I thought was in the heart, and the throat . . . about seven or eight times, and she just . . . she kept moving. It was like, . . . there was a smile on her face, she kept lunging for me, while she was dead . . . I wasn't trying to be vicious . . . it would look that way, but that wasn't the intent, but she kept lunging at me, over and over again, and the nature of her attack, I was, ah, mad enough I wanted to kill her, I felt that I was justified in self defense at that point . . ." The last petitioner saw of the knife "I tried to stick it in her heart . . . she's some kind of an animal."

Petitioner explained further "she's into a very strong sorcery trip, and that's why so many stab wounds . . . I'm not a goring [sic] person . . . I've never been violent in my life, but for some reason . . . there was some evil spirit behind her that was . . . it was like, it was like there was something within her that, that wasn't really part of her body . . . she was smiling . . . she was almost like enjoying playing and it was disgusting."

When petitioner subsequently gave the written confession he added: "My attack wasn't a vicious attack the first time. I was trying to stop the spirit that was moving in her.

She kept saying, 'Gary, Gary, Gary', as if she was enjoying it." When she stopped moving he washed himself, changed his clothes and then "My stepmother started moving again as if a spirit was in her. I took the knife and started stabbing her again. When I realized there was something in her that wouldn't stop moving, I started stabbing her in the head and heart. I wanted to kill the spirit that seemed to be attacking my spirit." Once again he changed his clothes but again found her moving and again stabbed her numerous times until all movement stopped. He then changed clothes once more and left.

As with the petitioner's testimony we note the testimony of the psychiatrists and psychologists is not without some disparity. Nevertheless, there is ample evidence which, under a proper insanity instruction, could have been considered by the jury as a matter of defense.

Prior to trial, petitioner made a motion to acquit on the ground of insanity pursuant to RCW 10.77.080. Three psychiatrists, Doctors Jarvis, Allison and Bremner and a psychologist, Dr. Trowbridge, were called to testify. They agreed petitioner suffered from paranoid schizophrenia both at the time of the killing and at the time of trial. Although stating it differently, all four appeared to agree that petitioner believed he was an agent of God, required to carry out God's directions. They also agreed that petitioner believed God commanded him to kill his stepmother and that he was therefore obligated to kill the "evil spirit". Consequently, all doctors concurred he was legally insane at the time of the murder.

The trial court denied the motion for acquittal and submitted the issue of insanity to the jury. At trial, the four doctors repeated their earlier testimony. All agreed that at the time of the killing, and at the time of trial, petitioner suffered from the mental disease of paranoid schizophrenia. While expressing their views in slightly different ways, they agreed petitioner understood that, as a mechanical thing, he was killing his stepmother and knew it was against the laws of man. They stressed, however, that at the time, he

was preoccupied with the delusional belief that his step-mother was an agent of satan who was persecuting him, as were others like Yasser Arafat and the Ayatollah Khomeini. He believed he was being directed by God to kill satan's angel and that by so doing, he was obeying God's higher directive or law. At this time he believed himself to be a messiah and in fact compared himself with Jesus Christ.

The doctors pointed out, in different ways, that because of his delusional beliefs, petitioner felt God had directed him to send her from this life to another. He had no remorse over the killing. He felt it was justified by God and that he was merely doing a service. "He felt he would generally be protected from any difficulties . . . because 'God would not allow it to happen'."

Concerning the legal tests for insanity the mental health experts opined that while he understood it was against the law to kill, he believed he was responding to God's directive and thus had an obligation to rid the world of this "demon", "sorceress" or "evil spirit". Thus, while technically he understood the mechanical nature of the act, he did not have the capacity to discern between right and wrong with reference to the act. Some of the doctors expressed the clear view that at the time of the killing, he was unable to appreciate the nature and quality of his acts. No doctor contended otherwise.

Concerning petitioner's insanity defense the trial court gave standard WPIC pattern jury instruction 20.01, but, over petitioner's exception, added a last paragraph which defines "right and wrong".

In addition to the plea of not guilty, the defendant has entered a plea of insanity existing at the time of the act charged.

Insanity existing at the time of the commission of the act charged is a defense.

For a defendant to be found not guilty by reason of insanity you must find that, as a result of mental disease or defect, the defendant's mind was affected to such an extent that the defendant was unable to perceive the nature and quality of the acts with which the defendant

is charged or was unable to tell right from wrong with reference to the particular acts with which defendant is charged.

> What is meant by the terms "right and wrong" refers to knowledge of a person at the time of committing an act that he was acting contrary to the law.

(Italics ours.) Petitioner, on the other hand, proposed the use of WPIC pattern jury instruction 20.01 which does not contain the last paragraph.

Petitioner argues that the trial court should have left the term "right and wrong" undefined as provided by the Legislature in RCW 9A.12.010. At the very least, it is urged, "right and wrong" should not have been defined in such a way as to exclude from the jury's deliberation the consideration of "right and wrong" in terms of one's ability to understand the moral qualities of the act.

At the time this case was tried, the Court of Appeals had just issued *State v. Crenshaw,* 27 Wn. App. 326, 617 P.2d 1041 (1980) which approved the instruction challenged herein. Subsequent thereto this court affirmed the Court of Appeals opinion in *State v. Crenshaw,* 98 Wn.2d 789, 659 P.2d 488 (1983). We did so on three alternative grounds, the ramifications of which need not be discussed here.

Insofar as the instant case is concerned, however, our discussion of *Crenshaw* also recognized an exception to the alternative grounds set forth therein. That exception is controlling here:

> A narrow exception to the societal standard of moral wrong has been drawn for instances wherein a party performs a criminal act, knowing it is morally and legally wrong, but believing, because of a mental defect, that the act is ordained by God: such would be the situation with a mother who kills her infant child to whom she is devotedly attached, believing that God has spoken to her and decreed the act. Although the woman knows that the law and society condemn the act, it would be unrealistic to hold her responsible for the crime, since her free will has been subsumed by her belief in the deific decree.

(Citations omitted.) *Crenshaw,* at 798. Consequently, as we held in *Crenshaw,* one who believes that he is acting under

the direct command of God is no less insane because he nevertheless knows murder is prohibited by the laws of man. Indeed, it may actually emphasize his insanity. *People v. Schmidt*, 216 N.Y. 324, 110 N.E. 945 (1915).

In the instant case there is considerable evidence (although not unanimous) from which the jury could have concluded that petitioner suffered from a mental disease; that he believed his stepmother was satan's angel or a sorceress; that he believed God directed him to kill his stepmother; that because of the mental disease it was impossible for him to understand that what he was doing was wrong; and, as stated in *Crenshaw* at page 798, that his free will had "been subsumed by [his] belief in the deific decree." The last paragraph of the trial court's challenged instruction precluded the jury's consideration of these factors and thus runs afoul of the *Crenshaw* exception. In short, the instruction prevented the jury from considering those essential relevant facts that formed petitioner's theory of the case. To this extent the trial court erred by adding the definitional paragraph to the instruction.

While we hold the facts of this case fall within the *Crenshaw* exception, we are compelled to observe that the scope of this exception must be determined on a case by case basis.

## II

During investigation of the murder, a pubic hair was found on the victim's knee and another in her hand. These hairs plus known pubic hair samples from petitioner were sent to the FBI laboratory. Petitioner first made objection to use of the pubic hair by way of a motion in limine. Later, during the course of the trial, he objected to admission of the pubic hairs as well as testimony about them including the FBI expert's comparison of the two pubic hairs with samples taken from petitioner.

The State asserts admission of the hair and the related testimony was essential to identification of petitioner as the victim's assailant and thus was relevant under ER 402. Petitioner concedes the hair and allied testimony may have

been relevant but contends that since the State had his two detailed confessions as well as his bloody foot and palm prints from the scene of the crime, petitioner's identity was not an issue. It is urged that the two pubic hairs were at best cumulative and highly prejudicial, raising an unsubstantiated inference of some type of sexual attack by petitioner. This, it is said, could only inflame the passions of the jury and thus, although technically relevant, would be inadmissible under ER 403 which provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . or needless presentation of cumulative evidence.

There seems little question that all agree the challenged evidence would in fact be prejudicial. The State's argument seems to center on the fact that all evidence tending to convict is prejudicial; that the State is entitled to show all circumstances surrounding the killing; and, that by pleading not guilty, petitioner raised the issue of identity. These arguments do not, however, address the real question of whether the *probative value* of the challenged evidence is *substantially outweighed by the danger of unfair prejudice.*

In this regard we note with interest the official comment to ER 403 which indicates that in deciding to exclude evidence on the ground of unfair prejudice, the trial court should consider the availability of other means of proof. In the instant case, the State had available for the jury's consideration two unchallenged detailed confessions as well as petitioner's bloody foot and palm prints taken from the crime scene. Thus, there was no actual doubt as to the assailant's identity. Additionally, the FBI agent could not actually identify the pubic hair as having come from petitioner. Rather, in comparing the two pubic hairs (from an unknown source) with the pubic hair taken from petitioner (a known source), the expert stated only that the hair "could have originated from this individual."

The drafters of ER 403 also point out the necessity of considering the procedural factors as they may favor admission or exclusion, depending on the circumstances. Granted, the State had the burden of establishing that petitioner was indeed the killer. The record makes clear, however, that at no time throughout the trial did petitioner deny he killed his stepmother. Thus, at best, the challenged evidence was needlessly cumulative of unchallenged relevant facts of an undenied killing.

Since ER 403 was taken directly from Fed. R. Evid. 403, the Federal Advisory Committee's note is of interest wherein it is stated that "'[u]nfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See* 10 J. Moore, *Federal Practice* § 403.01[3], at IV–67 (1980). In the instant case we must agree with petitioner that the admission of the two pubic hairs, their relevance depending solely on the slender reed that they *could have* originated from petitioner, would place before the jury both unnecessary and unfair prejudicial evidence that would divert them from the facts which should control their verdict. Instead of leading strictly to identity of the assailant the nature of the evidence would strongly tend to suggest a possible sexual attack or sexual abuse—a suggestion wholly unsupported by the record. In sum, there was an objectionable tendency to prejudice the jury without any exigency of proof to make it necessary or important that the cause be proved in that manner.

We therefore reverse the trial court on this issue.

### III

Approximately two months prior to the killing, the victim visited her daughter in California. Over petitioner's objection the daughter testified the victim had told her she was having problems with the petitioner. Additionally, the victim's ex–husband testified she told him one reason she went to California was her fear of petitioner.

The State argues the testimony was admissible, as an

exception to the hearsay rule, to establish the victim's state of mind as it related both to the issue of self–defense and petitioner's premeditation. We do not agree.

■ In the instant case, self–defense was a nonissue raised solely by the State. It was injected into the trial during the State's case in chief when the State admitted in evidence petitioner's taped confession which has been set forth in detail above. Nothing in the confession attempted to justify the killing by the fact that she possessed a knife. There was no assertion of self–defense in the true legal sense. Rather, he stabbed her because she was "symbolic with the 'Scarlet Whore Beast' . . . very much into sorcery . . . [taking] God's truth and [twisting] it into sorcery." This was mentioned again in the petitioner's case in chief during the direct examination of Dr. Jarvis. As before, the discussion related only to the necessity of defending himself, under the direction of God, from a "witch" or "one of satan's angels". The testimony did not refer to any claims of self–defense stemming from her having been armed with the knife.

Throughout the trial, including the State's cross examination of the mental health experts, self–defense was connected only with the insane delusion caused by petitioner's diseased mind. During that time, petitioner was not acting in self–defense in the real sense, but only in the insane delusion that he was acting under God's order to send a "sorceress" to another life. The foregoing makes it clear that petitioner's position was consistent with his defense of insanity, rather than with any separate claim of self–defense.

In this same vein, it must be noted that despite the State's reliance on the self–defense argument to justify its challenged hearsay evidence, no one, including the State, submitted a self–defense instruction. In fact, defense counsel informed the court specifically that petitioner was *not* raising a claim of self–defense. Thus, the jury could only have considered the testimony as it related to the actual killing and the insanity defense. This being the case, the

hearsay testimony of the ex–husband and the daughter could not have been relevant under the "state of mind" exception to the hearsay rule. This is true because the victim's state of mind itself was not relevant to any material issue before the jury. At best, it bears only a remote or artificial relationship to the legal or factual issues actually raised and thus was inadmissible. *See State v. Parr*, 93 Wn.2d 95, 98–104, 606 P.2d 263 (1980); *see also United States v. Brown*, 490 F.2d 758 (D.C. Cir. 1973).

The State also seeks to justify the challenged hearsay testimony by asserting it was relevant to prove premeditation. Once again we are compelled to disagree with the State's argument. To the extent the hearsay testimony was admitted to prove the petitioner's thought process, we agree with the Court of Appeals that it was not admissible. *State v. Parr, supra.*

Finally, the Court of Appeals indicates that if the trial court did err by admitting the hearsay testimony of the victim's ex–husband and daughter, such error was harmless. It is of interest the State does not rely on that harmless error theory. Rather, the trial court's position, apparently joined by the State, is that although the testimony was prejudicial, its probative value outweighed the prejudicial effect.

We do not agree with either theory. First, the potential for misuse of the testimony or misunderstanding of its application is too great, carrying with it a substantial likelihood of prejudice to petitioner's case. Consequently, we cannot agree the error was harmless.

Second, as discussed above, the hearsay testimony was not relevant to any material issue before the court. Thus, it was clearly inadmissible. Moreover, since the testimony was irrelevant it had no probative value and was therefore inadmissible on that ground.

The cause is reversed and remanded for a new trial consistent with this opinion.

WILLIAMS, C.J., and DOLLIVER and PEARSON, JJ., concur.

DORE, J. (concurring)—Last February, we decided the case of *State v. Crenshaw,* 98 Wn.2d 789, 659 P.2d 488 (1983). Both *Crenshaw* and the subject case were almost factually identical; both involved outrageous, vicious, messy murders.

### Crenshaw

Crenshaw stabbed his wife 27 times, one of which stabs was fatal. He later returned and decapitated her and then buried her remains in a hidden place. Cameron committed an equally brutal murder; he stabbed his stepmother 97 times. In *Crenshaw,* there was testimony by medical experts that he had delusions of grandeur, religiosity (including a belief in his possession of special powers), auditory hallucinations, lack of insight, and extreme emotional lability.

A psychiatrist testified that Crenshaw was suffering from a paranoid state and was in remission from former psychotic episodes. He had a history of mental problems. He was hospitalized in his home state of Texas 15 times between 1970 and 1978 where he was diagnosed as a paranoid schizophrenic. Crenshaw testified he knew that if he killed his wife he was violating the law, but he believed he had a duty to do it under the teaching of his *Moscovite "religious" beliefs.*

### Cameron

Medical experts testified that Cameron suffered from paranoid schizophrenia both at the time of the killing and at the time of the trial. Cameron related his feelings about the incident, "I felt confused . . . I felt no different from the beginning than the end there was no difference. . . . legally I know, that it is against the law, but as far as right and wrong in the eye of God, I would say I felt no particular wrong." Cameron believed that God commanded him to kill his stepmother and that he was, therefore, obligated to kill the "evil spirit". All doctors agreed that Cameron was legally insane at the time of the murder.

Concerning the legal tests for insanity, the mental health

experts opined that while Cameron understood it was against the law to kill, he believed he was responding to God's directive and thus had an obligation to rid the world of this "demon", "sorceress" or "evil spirit".

I

Both Crenshaw and Cameron came to this court challenging the identical instruction which defined insanity in terms *limited* to legal right and wrong and *rejecting* insanity based on moral right and wrong.

Such instruction read as follows:

> In addition to the plea of not guilty, the defendant has entered a plea of insanity existing at the time of the act charged.
> Insanity existing at the time of the commission of the act charged is a defense.
> For a defendant to be found not guilty by reason of insanity you must find that, as a result of mental disease or defect, the defendant's mind was affected to such an extent that the defendant was unable to perceive the nature and quality of the acts with which the defendant is charged or was unable to tell right from wrong with reference to the particular acts with which defendant is charged.
> *What is meant by the terms "right and wrong" refers to knowledge of a person at the time of committing an act that he was acting contrary to the law.*

(Italics mine.)

In both cases, it was argued "right and wrong" should not have been defined in such a way as to exclude from the jury's deliberation the consideration of "right and wrong" in terms of one's ability to understand the moral qualities of the act. In *Crenshaw,* the majority rejected Crenshaw's argument and held that the instruction was a proper statement of the law.

The issue in both cases pertaining to the subject instruction was whether the terms "right" and "wrong", as used in RCW 9A.12.010(1)(b), should be qualified for the jury. In both cases at trial, the jury was instructed the defendant would not be legally insane if he knew legal right from legal

wrong. Both contended the trial court erred in defining right and wrong as legal right and wrong. Contrary to *Crenshaw,* the majority here, at page 527, holds that the subject instruction was prejudicial error, saying, "In short, the instruction prevented the jury from considering those essential relevant facts that formed petitioner's theory of the case. To this extent the trial court erred by adding the definitional paragraph to the instruction."

The majority in *Crenshaw* stated at page 798:

> A narrow exception to the societal standard of moral wrong has been drawn for instances wherein a party performs a criminal act, knowing it is morally and legally wrong, but believing, because of a mental defect, that the act is ordained by God: such would be the situation with a mother who kills her infant child to whom she is devotedly attached, believing that God has spoken to her and decreed the act. *See People v. Schmidt,* [216 N.Y. 324, 110 N.E. 945 (1915)] at 339. Although the woman knows that the law and society condemn the act, it would be unrealistic to hold her responsible for the crime, since her free will has been subsumed by her belief in the deific decree. *People v. Schmidt, supra.*

Although arriving at a directly opposite result, the majority in the subject case at page 527 seizes on this narrow exception to decide the case, saying, "While we hold the facts of this case fall within the *Crenshaw* exception . . ."

Crenshaw performed his dastardly murder believing he had a duty to do it under the teaching of his Moscovite "religious" beliefs. Cameron committed a very similar, vicious murder on the basis that God commanded him to kill his stepmother and that he was obligated to kill the evil spirit. I frankly don't see much or any distinction, however, in carrying out or executing a murder under the direction of God or Crenshaw's Moscovite religious beliefs, or under the beliefs of a prophet, Buddha, etc.

*Crenshaw,* in finding that the subject instruction did not constitute prejudicial error wherein the definition of right and wrong was limited to legal right and wrong, at page 805

concluded:

> We thus conclude that the additional statement in instruction 10 was not improper, or, at the very least, that it was harmless error.
>
> Nevertheless, we do not believe that, in the future, such a comment should be necessary. As the Legislature has chosen to codify the *M'Naghten* test in statutory form, it would be preferable to have this test presented to the jury without any elaboration. This would permit both parties to argue their theories of the case. It would also prevent the possibility that the jury would presume that ignorance of the law is a defense in cases wherein it may not be as clear as it was here that the person knew the illegality of his act. *See State v. Corley,* 108 Ariz. 240, 495 P.2d 470 (1972). *Thus, we hold prospectively that as a general rule no definition of wrong should accompany an insanity defense instruction.*

(Italics mine.)

The majority in the subject case, commenting on the identical instruction and in particular the last three lines, states at page 527:

> The last paragraph of the trial court's challenged instruction precluded the jury's consideration of these factors and thus runs afoul of the *Crenshaw* exception. In short, the instruction prevented the jury from considering those essential relevant facts that formed petitioner's theory of the case. To this extent the trial court erred by adding the definitional paragraph to the instruction.

Both *Crenshaw* and the majority here seem to agree that, in the future when the issue of insanity is raised as a defense, the trial judge should give standard WPIC pattern jury instruction 20.01 without limiting language such as "[w]hat is meant by the terms 'right and wrong' refers to knowledge of a person at the time of committing an act that he was acting contrary to the law."

## CONCLUSION

As this case does not reverse *Crenshaw,* which provided prospectively for giving WPIC 20.01 in all future insanity cases, I conclude in the subject case that in *all* future insanity cases WPIC 20.01 should be given without change

or modification and that defendants' defense counsel are free to argue legal and/or moral right and wrong as an affirmative defense.

UTTER, J., concurs with DORE, J.

DIMMICK, J. (dissenting in part)—In *State v. Crenshaw*, 98 Wn.2d 789, 659 P.2d 488 (1983) we began the odyssey. Today's majority opinion now leads us further into the Serbonian bog. In *Crenshaw* we recognized that one who knew the illegality of his act was not necessarily "'beyond any of the influences of the criminal law'" and thus not legally insane. *Crenshaw*, at 797. We thus found support for upholding an instruction identical to the one given in this case. However, *Crenshaw* contained several alternative holdings. One of which was that "legal" wrong and "moral" wrong were synonymous in that particular case. In explaining this holding, we included as dicta an exception for "deific decrees". *Crenshaw*, at 798. The majority in the instant case relies on this exception, holding that this court shall determine the scope of this exception on a case by case basis. Majority opinion, at 527. The majority thus condemns us to review every proffered insanity defense.

The exception itself is inconsistent with a legal definition of wrong. Additionally, what exactly does it entail? Apparently a person is legally insane if God gives him a direct command, such as the one Mr. Cameron allegedly received. However, a person is not legally insane if God does not directly ordain the act, but the person merely interprets his religious beliefs to require the act. *See State v. Crenshaw, supra*. In sum, I predict many problems with this exception.

Thus, I would affirm the Court of Appeals and trial court's holdings that the insanity instruction was proper in this case. The preferable approach, however, as later suggested in *Crenshaw*, is that the definition of "wrong"

should not be included in an instruction in the future.

Rosellini and Brachtenbach, JJ., concur with Dimmick, J.

Reconsideration denied January 11, 1984.