IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JAVIER ROMERO, *Appellant*.

No. 1 CA-CR 18-0334
FILED 3-31-2020

Appeal from the Superior Court in Maricopa County
No.  CR 2014-001009-001
The Honorable Peter C. Reinstein, Judge, *Retired*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Terry M. Crist III
*Counsel for Appellee*

Michael J. Dew Attorney at Law, Phoenix
By Michael J. Dew
*Counsel for Appellant*

_____

**OPINION**

Judge Michael J. Brown delivered the opinion of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Samuel A. Thumma joined.

_____

**B R O W N**, Judge:

¶1        Javier Romero appeals from his convictions and sentences for second-degree murder and aggravated assault.  He argues the superior court (1) committed fundamental error by failing to provide an additional jury instruction defining legal insanity; (2) improperly precluded testimony addressing the consequences of a guilty except insane ("GEI") verdict; and (3) should have found him GEI as a matter of law.  For the following reasons, we affirm.

**BACKGROUND**

¶2        While Romero was working in a restaurant, he suddenly grabbed a large kitchen knife and repeatedly stabbed a co-worker to death. Romero then moved the victim's body to a nearby room and attempted to clean up the blood.  Other employees, including Romero's brother, discovered the body shortly after the stabbing.  Security cameras also captured the incident.  When Romero's brother saw what had happened, he grabbed Romero and asked him what he had done.  Romero did not respond; his brother testified he "looked like a deer in the headlights . . . like he was shocked [at] what he did."

¶3        When police officers arrived, they found Romero waiting in the restaurant with his supervisor, who explained what Romero had done. Romero had a blank expression on his face and did not seem to understand instructions. Noticing extensive cuts on Romero's arms, officers took him to a hospital for treatment.  Romero told hospital staff his wounds were self-inflicted.  After his wounds were cared for, Romero reached out from his hospital bed and grabbed at a nearby officer's handgun.  The officer prevented Romero from obtaining the weapon and restrained him, after which Romero looked at the officer and said, "I don't know why I did that."

¶4        As an affirmative defense, Romero sought to prove he was GEI under A.R.S. § 13-502, which states that "[a] person may be found [GEI] if at the time of the commission of the criminal act the person was afflicted with a mental disease or defect of such severity that the person did not

know the criminal act was wrong." At trial, the superior court's preliminary instructions informed the jury that if it found beyond a reasonable doubt that Romero committed the charged offenses, it would then be required to decide whether he proved by clear and convincing evidence he was GEI when the crimes were committed.

¶5        The three medical experts who testified at trial agreed that Romero suffered from schizophrenia but disagreed as to whether Romero knew at the time that his acts were wrong. Dr. James Sullivan, testifying for the defense, opined that Romero did not know his acts were wrong due to a paranoid delusional episode. Dr. Janet Perry, the court-appointed expert, agreed. But the State's expert, Dr. James Seward, offered no definitive conclusion as to whether Romero knew his acts were wrong. Dr. Seward opined that when Romero began stabbing the victim, Romero was likely not aware what he was doing was wrong, but there were signs he became aware what he was doing was wrong in the course of the stabbing. Dr. Seward also stated it was possible that Romero's "behaviors were all some kind of manifestation of his psychotic state rather than being an awareness that the act was wrong."

¶6        The jury found Romero guilty on both counts, rejecting his GEI defense. This timely appeal followed.

## DISCUSSION

¶7        Our standard of review of the asserted errors depends on whether Romero objected in the superior court. If he objected and we find error, the State must prove the error was harmless. *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 18 (2005). Otherwise, we review for fundamental error resulting in prejudice. *See State v. Escalante*, 245 Ariz. 135, 140, ¶ 12 (2018).

### A.        Jury Instructions

¶8        Romero argues the superior court erred by giving instructions that misinformed the jury of the elements required to establish GEI under A.R.S. § 13-502(A). We review the propriety of jury instructions de novo. *State v. Fierro*, 220 Ariz. 337, 338, ¶ 4 (App. 2008). Instructions inform the jury how to apply the law, *State v. Noriega,* 187 Ariz. 282, 284 (App. 1996), and we will not reverse unless the instructions, taken together, would have misled the jurors, *State v. Doerr*, 193 Ariz. 56, 65, ¶ 35 (1998). Despite our de novo review of the legal sufficiency of the jury instructions, because Romero did not object at trial to the instructions given, we will reverse only if the court committed fundamental error resulting in prejudice. *See Fierro*, 220 Ariz. at 340, ¶ 11.

¶9        Romero takes issue with two of the superior court's instructions.  The first one paraphrased the standard under A.R.S. § 13-502(A) and quoted the Revised Arizona Jury Instructions ("RAJI") Statutory Criminal 5.02-1 (4th ed. 2018):

> You must determine from the evidence whether the defendant was [GEI] at the time the crime was committed.  A defendant is [GEI] if at the time of the crime the defendant was afflicted with a mental disease or defect of such severity that the defendant did not know the criminal act was wrong.

The second instruction, paraphrasing A.R.S. § 13-105(10)(b) and quoting RAJI Statutory Criminal 1.0510(b), stated:

> "Knowingly" means that a defendant acted with awareness of or belief in the existence of conduct or circumstances constituting an offense.  It does not mean that a defendant must have known the conduct is forbidden by law.

¶10        Romero argues these instructions wrongly informed the jury it could find he knew his conduct was wrong even if he could not understand it was forbidden by law.  He contends the instructions given were "in direct contradiction to the elements of the [GEI] affirmative defense," and the superior court should have sua sponte given the jury instruction at issue in *State v. Corley*, 108 Ariz. 240, 242–43 (1972) and *State v. Tamplin*, 195 Ariz. 246, 247, ¶ 4 (App. 1999), to explain what "wrong" means in the context of A.R.S. § 13-502.  The relevant instruction given in those two cases stated:

> Knowledge that an act was wrong, as the phrase is used in these instructions, means knowledge that the act was wrong according to generally accepted moral standards of the community and not the defendant's own individual moral standards.  Knowledge that an act was forbidden by law will permit the inference of knowledge that the act was wrong according to generally accepted moral standards of the community.

*Corley*, 108 Ariz. at 242–43; *Tamplin*, 195 Ariz. at 247, ¶ 4 (hereinafter referred to as the "*Corley* instruction").  In those cases, the respective appellate courts rejected the defendants' arguments that the instruction should not have been given, whereas here Romero contends the court fundamentally erred by failing to give the same instruction.  *Corley*, 108 Ariz. at 243; *Tamplin*, 195 Ariz. at 249, ¶ 12.

4

¶11 To address whether the superior court was required to sua sponte give the *Corley* instruction at Romero's trial, we begin with the well-accepted premise that unless the legislature plainly indicates otherwise, a crime "requires both guilty conduct and a culpable mental state." *See e.g., State v. Slayton*, 214 Ariz. 511, 514, ¶ 9 (App. 2007). Under Arizona's criminal code, a person acts "knowingly" when, "with respect to conduct or to a circumstance described by a statute defining an offense," the person engages in such conduct with the "aware[ness] or belie[f] that the . . . conduct is of that nature or that the circumstance exists." A.R.S. § 13-105(10)(b). A defendant need not have acted, however, with "any knowledge of the unlawfulness of the act or omission." *Id.*

¶12 The criminal law's general indifference to whether a defendant knows an act is criminal reflects a second core principle— ignorance of the law is no defense. *See* A.R.S. § 13-204(B); *State v. Morse*, 127 Ariz. 25, 31 (1980). "Knowingly" thus refers to factual knowledge, not knowledge of an act's legal or moral impropriety. *See State v. Francis*, 243 Ariz. 434, 436–37, ¶ 12 (2018) (collecting cases holding "that knowledge of an act, even without understanding its legal significance, can establish the culpable mental state necessary for conviction of a crime that must be 'knowingly' committed"); *see also Bryan v. United States*, 524 U.S. 184, 193 (1998) ("[T]he term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense.").

¶13 Under the statutes at issue here, the State was required to prove that Romero had an awareness of or a belief that his conduct at the restaurant was of such a nature that it would "cause death or serious physical injury," A.R.S. § 13-1104 (second degree murder), and that in the hospital he was aware of or had a belief that he was "tak[ing] or attempt[ing] to exercise control over" a firearm belonging to an officer, A.R.S. § 13-1204(A)(9)(a) (aggravated assault). Thus, the superior court's instruction, stating that knowingly "does not mean that a defendant must have known the conduct is forbidden by law," properly reflects Arizona law.

¶14 Turning to the GEI instruction, wrongfulness in context of a GEI defense has its origins in "what is known as the Rule of *M'Naghten's Case* as the test for criminal insanity," which Arizona has long followed. *See State v. Schantz*, 98 Ariz. 200, 206 (1965) (collecting cases). The Rule states as follows:

> [T]o establish a [defense] on the ground of insanity, it must be
> clearly proved that, at the time of the committing of the act,

5

the party accused was [laboring] under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.

*M'Naghten's Case*, 8 Eng. Rep. 718, 722 (1843). The Rule's first part "asks about cognitive capacity: whether a mental defect leaves a defendant unable to understand what he is doing." *Clark v. Arizona*, 548 U.S. 735, 747 (2006). Its second part addresses the "lack of moral capacity: whether a mental disease or defect leaves a defendant unable to understand that his action is wrong." *Id.*

¶15 After its adoption in 1977, Arizona's courts consistently understood A.R.S. § 13-502 as codifying *M'Naghten*. *See, e.g.*, *State v. Mott*, 187 Ariz. 536, 541 (1997); *State v. Zmich*, 160 Ariz. 108, 110 (1989); *State v. Heartfield*, 196 Ariz. 407, 410 (App. 2000). In 1993, however, our legislature deleted the first prong of the test from the statute's text, so that now a person is GEI only if a "mental disease or defect" caused the person to "not know the criminal act was wrong." A.R.S. § 13-502(A); *see Clark*, 548 U.S. at 742 (upholding changes to Arizona's moral incapacity-based insanity test as constitutional); *cf. Kahler v. Kansas*, No. 18-6135, 2020 WL 1325817, at *5–6 (U.S. Mar. 23, 2020) (upholding Kansas's cognitive incapacity-based insanity test as constitutional).

¶16 Though the meaning of "wrong," as used in *M'Naghten*, "has been an enigma since the standard was . . . adopted," Arizona defines the word "wrong" in accordance with generally accepted moral standards of the community. *Corley*, 108 Ariz. at 243 (citing *State v. Malumphy*, 105 Ariz. 200, 212 (1969) (McFarland, J., specially concurring)); *see also State v. Skaggs*, 120 Ariz. 467, 472 (1978) (citing *Malumphy*). This concept necessarily "include[s] both legal and moral wrong." *Corley*, 108 Ariz. at 243.

¶17 As relevant here, in pressing his GEI defense, Romero was required to prove by clear and convincing evidence that his mental disease or defect rendered him unable to know his acts were legally and morally wrong according to the standards of the community. *Id.* Romero's argument is that the instructions informed the jury that it could find he knew his acts were wrong—and thus could not prove his GEI defense—even if he did not know the acts were forbidden by law. What Romero asserts as error, however, is a correct statement of the law. Indeed, *M'Naghten* contemplated the scenario where a defendant lacks knowledge that his act was illegal:

> If the question were to be put as to the knowledge of the accused solely and exclusively with reference to the law of the land, it might tend to confound the jury, by inducing them to believe that an actual knowledge of the law of the land was essential in order to lead to a conviction; whereas the law is administered upon the principle that every one must be taken conclusively to know it, without proof that he does know it. If the accused was conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable. . . .

*M'Naghten's Case*, 8 Eng. Rep. at 723; *accord Malumphy*, 105 Ariz. at 212. Stated differently, evidence of a defendant's inability to know an act has been criminalized is insufficient to establish a GEI defense. Moreover, if the State counters this defense with evidence showing the defendant was aware his conduct was illegal, then it would not be improper for the jury to conclude that he also knew his conduct was morally wrong. *See Corley*, 108 Ariz. at 243 (rejecting defendant's challenge to jury instruction stating in part that "'[k]nowledge that an act was forbidden by law will *permit the inference of knowledge* that the act was wrong according to generally accepted moral standards of the community'") (emphasis added).

¶18 In the oft-cited case of *People v. Schmidt*, 110 N.E. 945 (N.Y. 1915), the court further explained the difference between legally and morally wrong. *See Malumphy*, 105 Ariz. at 210–12. There, the defendant argued the trial court mis-instructed the jury under a *M'Naghten*-type statute by limiting "wrong" to mean no more than "contrary to the laws of the state." *Schmidt*, 110 N.E. at 946 (internal quotations omitted). On appeal, however, the court was "unable to accept the view that the word 'wrong' . . . [should] receive so narrow a construction." *Id.* Analyzing *M'Naghten*, the court explained that "a defendant who knew nothing of the law would none the less be responsible if he knew that the act . . . was morally wrong." *Id.* at 947. Although *M'Naghten* had not explicitly considered "[w]hether [a defendant] would also be responsible if he knew [the act] was against the law, but did not know it was morally wrong," *id.*, the *Schmidt* court pointed out that, in most cases, the analysis will be coterminous because "[o]bedience to the law is itself a moral duty." *Id.* at 949.

¶19 By not limiting "wrong" to mean "against the law," the GEI instruction here did not incorrectly bar the jury from considering evidence related to Romero's understanding of both the legal and moral wrongness of his acts. The instruction accurately reflected § 13-502, and Romero has

not shown that modeling the jury instruction on the statutory language was improper. *See State v. Harris*, 151 Ariz. 236, 238 (1986) (upholding jury instructions for burglary based on statutory language, despite subsequent clarifying case law). In the absence of any authority requiring the *Corley* instruction, we cannot say the superior court erred here. *Cf.* 1 Wayne R. LaFave, *Substantive Criminal Law* § 7.2(b)(4) (3d ed. 2018) (noting that this prong of *M'Naghten* is often "simply given to the jury without explanation").

¶20 We appreciate Romero's argument that the superior court should have given the *Corley* instruction because it more accurately describes this unique area of law. Thus, in future cases we encourage trial judges to give the *Corley* instruction because it provides juries, expert witnesses, and counsel a better understanding of the GEI defense. The instruction may have been helpful in this case given that the State's expert was the only individual at trial who offered the jury with a definition of "wrong," and he incorrectly stated that "to the best of my understanding, in Arizona, not knowing that an action was wrong refers to the legal wrongness as opposed to moral wrongness." Nonetheless, the court's failure to sua sponte give the *Corley* instruction was not improper.

### B. Testimony Regarding Consequences of a GEI Verdict

¶21 Romero also argues the superior court erred by not allowing him to examine Dr. Perry about the consequences of a GEI verdict. Romero contends he needed to question Dr. Perry about the issue "to rebut the State's insinuation that the GEI defense was less punishment." Because Romero raised this issue in the superior court, which rejected his argument, we review that ruling for harmless error.

¶22 We review the superior court's evidentiary rulings and restrictions on witness examination for an abuse of discretion. *State v. McGill*, 213 Ariz. 147, 156, ¶ 40 (2006). Because the decision of which punishment to impose is generally the court's task alone, juries are not permitted to consider the consequences of their verdicts. *State v. Cornell*, 179 Ariz. 314, 327 (1994).

¶23 During cross-examination of court-appointed expert Dr. Perry, the prosecutor questioned whether Romero was malingering when Perry interviewed him in the following exchange:

> Q. Okay. . . . A person in Mr. Romero's position,
> hypothetically may consider, a finding of legal insanity to be
> a benefit over a finding of guilt in a courtroom?

A.    I did not discuss that [with] him.

Q.    Okay.    But, hypothetically, I mean, people may perceive one option is better than the other?

**¶24**    Romero objected to this line of questioning, but the superior court overruled him.  The prosecutor continued:

Q.    . . . A subject that you're examining such as Mr. Romero --

A.    Uh-huh.

Q.    -- may in the time he's had between the incident and when he's being evaluated -- may come in his mind, rightly or wrongly, to a realization that one result might be better for him than another?

A.    Yes.

Q.    More in his self-interest?

A.    Yes. . . .

Q.    And that's one of the problems in competency exams as well, test subjects may feel a certain result might be more favorable to them?

A.    Yes.

Q.    Now that might be true not just of persons charged with crimes, but anyone seeing someone in your profession?

A.    Yes.

. . .

Q.    . . . In your experience doing GEI cases, have you encountered test subjects who fabricate information about the offense?

A.    Yes.

Q.    And usually, would that be hypothetically to make themselves look better?

A. Yes.

¶25 At an ensuing bench conference, Romero argued that the prosecutor's questions "opened the door to punishment . . . [by] asking those questions about what [Romero's] feelings were about being convicted" and requested to ask the witness "about what happens if a person gets convicted of GEI, where do they go." The superior court ultimately denied Romero's request to ask Dr. Perry about the consequences of a GEI verdict.

¶26 Romero cites authority discussing appropriate factors for the jury to consider during a capital case's penalty phase in support of his assertion that the jury should have been informed about the consequences of a GEI verdict. *See Simmons v. South Carolina*, 512 U.S. 154 (1994) (plurality opinion); *State v. Escalante-Orozco*, 241 Ariz. 254 (2017), *abrogated in part by Escalante*, 245 Ariz. at 140–41, ¶ 16. But nothing in those cases implies that a jury should be allowed to consider the consequence of its verdict during a trial's guilt phase. *See, e.g.*, *Simmons*, 512 U.S. at 163 (explaining that "[a]rguments relating to a defendant's future dangerousness ordinarily would be inappropriate at the guilt phase of a trial" but may be considered when the jury "has sentencing responsibilities").

¶27 In fact, our supreme court has rejected a similar argument. *See State v. McLoughlin*, 133 Ariz. 458, 461 (1982). In *McLoughlin*, "an unidentified third party" told a juror the defendant would go free if the jury found him insane, and "[t]his juror passed along this information to the rest of the jury" during deliberations. *Id.* at 460. The court made clear that "this information is always inadmissible." *Id.* at 461. Although ultimately reversing his conviction, the court nonetheless disagreed with the defendant's assertion that "an instruction correctly stating what would have happened had he been acquitted by reason of insanity . . . would have avoided the problem caused by the juror misconduct." *Id.* Because "disposition of a defendant upon the jury's verdict has nothing to do with the defendant's guilt or innocence," it can "never be considered by the jury in its deliberations." *Id.* at 461–62. In other words, the court would not correct an error by allowing another error to occur. *See id.* Consistent with this principle, the superior court properly instructed the jury not to consider Romero's possible punishment in its deliberations.

¶28 Furthermore, viewed in context, we do not view the questions posed to Dr. Perry as entering the impermissible area of punishment. Importantly, the prosecutor's questions contained qualified, conditional terms such as "hypothetically," "perceive," and "rightly or wrongly." And

they were generally sought to elicit possible explanations for malingering and why that was a concern for psychologists in many clinical situations. This was a relevant and proper subject of questioning, one Romero's counsel raised while examining Dr. Sullivan. And on re-direct, without mentioning consequences, defense counsel addressed whether and to what extent the issue of malingering contributed to Dr. Perry's opinions, giving Romero an adequate opportunity to rebut any implication that he might have been feigning his mental condition. Accordingly, the superior court acted within its discretion in denying Romero's request.

### C. GEI as a Matter of Law

**¶29** Citing A.R.S. § 13-103(B), and *State v. Bayardi*, 230 Ariz. 195 (App. 2012), Romero contends the superior court should have declared him GEI as a matter of law. We are aware of no authority that authorizes a court to take such action, and § 13-502 explicitly leaves insanity in the fact finder's hands. *See* A.R.S. § 13-502(D) (stating "if the finder of fact finds the defendant [GEI] . . . ."). Nor does *Bayardi*, which concerned the types of criminal defenses available under Arizona law, provide support. *Id.* at 198, ¶ 13. The issue there was whether the defendant's proffered statutory defense was "an affirmative defense, a justification defense or a defense that denies an element of the charge or responsibility." *Id.* at 198, ¶ 10. We held that the statute at issue created an affirmative defense, expressing no view about whether any affirmative defense—such as GEI—can be established as a matter of law. *Id.* at 201, ¶ 22. To the contrary, *Bayardi* contemplated that such defenses are questions of fact for the factfinder to resolve. *Id.* at 200, ¶ 20 (providing that affirmative defenses excuse a defendant from responsibility "[w]hen the requisite facts are established"). We therefore reject Romero's contention that the court should have found him GEI as a matter of law.

## CONCLUSION

**¶30** We hold that the superior court did not (1) commit fundamental error by failing to instruct the jury with more specificity on the definition of insanity; (2) abuse its discretion in precluding testimony about the consequences of a GEI verdict; or (3) err in failing to declare Romero GEI as a matter of law. We therefore affirm Romero's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:  AA