[No. 23431-5-I. Division One. September 17, 1990.]

THE STATE OF WASHINGTON, *Respondent,* v. FRANCISCO SALAZAR, *Appellant.*

204

*Terrence Kellogg,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Peter R. Goldman* and *Jeffrey Ramsdell, Deputies,* for respondent.

WEBSTER, J.—A jury convicted Francisco Salazar of one count of possessing cocaine with intent to manufacture or deliver. He appeals, challenging the particularity of an automobile description in a search warrant, the determination of probable cause to search the vehicle, the admission of testimony that the search was pursuant to a warrant, and the court's refusal to order disclosure of a confidential informant, including the limitation of cross examination as to whether a particular individual was the informant. We affirm.

### PARTICULARITY OF DESCRIPTION IN SEARCH WARRANT

Detective Mario Navarrete of the Seattle Police Department obtained the search warrant at 9:40 p.m. on June 28,

1988. The warrant described the premises to be searched as:

> 2607 NW 57th Str. in Seattle, King County, Washington, the west end of a pink duplex located on the southwest corner of 26th NW and NW 57th and a newer white General Motors car with a temporary license sticker in the rear window and the person[] of a Mex. Male 23, 5'6", 145# named Francisco aka Frank . . ..

The affidavit recited that within the past 24 hours a reliable informant

> was in contact with the Mexican Male known to the informant as Francisco aka Frank described above, *in the vehicle described above at the residence described above.* This informant observed cocaine . . . in the possession of Francisco in the vehicle.

(Italics ours.)

At 11 p.m., Detective Navarrete and other officers of the Seattle Police Department executed the warrant. They planned to search the person, house, and vehicle at the same time. They observed a white 1984 Buick Regal matching the description in the warrant in front of the duplex just prior to the search and stopped it as it began to drive away. Salazar was driving, his girl friend was in the front passenger seat, and a third individual was behind her. Navarrete found 10 individually wrapped 1–ounce baggies of cocaine under the driver's seat.

In a motion to suppress, Salazar argued that the vehicle description in the warrant was overbroad because it authorized a search of any "newer white General Motors car with a temporary license sticker in the rear window". The State responded as follows:

> We are not talking about just any newer American–made car that happens to be white in Seattle . . . . It was evident by the use of the conjunctions and the fact that the affidavit specifies all those places together that Officer Navarrete was referring to a particular car associated with a particular place and a particular individual.
>
> The defense just wants us to ignore the context of the affidavit and just look at the newer white American car, with nothing more.

The trial court agreed with the State. Applying a "common sense practical reading [of] the warrant", the court concluded:

> Officer Navarrete, in executing the warrant, could ascertain and identify the particular vehicle to be searched. I find that based essentially on the wording of the warrant itself and the fact that the house and the vehicle and the persons are all set forth in the conjunctive. I think that any reasonable officer, in executing that warrant, for example, an officer leaving from downtown Seattle and heading toward Ballard, would not stop and search any newer General Motors white car with a temporary license sticker in the rear window.
>
> I think a reasonable reading of that warrant would indicate to any officer executing it that it meant and intended that that vehicle was in some way connected with the residence to be searched. In fact, that's what the officers did in this case.
>
> It's also, I think, corroborated by the affidavit and the knowledge of Officer Navarrete that the confidential informant had observed the described Mexican male in the vehicle at the residence within the past 24 hours, and that the confidential informant had observed cocaine in the possession of Francisco in the vehicle at that time.

■ We uphold the trial court, including its reliance on the affidavit and the personal knowledge of the officer executing the warrant. As this court stated in *State v. Smith,* 39 Wn. App. 642, 648–49, 694 P.2d 660 (1984), *review denied,* 103 Wn.2d 1034 (1985):

> The Fourth Amendment provides that no warrants shall issue except those "particularly describing the place to be searched". A perfect description is not required. It "is enough if the description is such that the officer with a search warrant can with reasonable effort ascertain and identify the place intended." *Steele v. United States,* 267 U.S. 498, 503, 69 L. Ed. 757, 45 S. Ct. 414 (1925).

(Footnote omitted.) This general statement is further refined in 2 W. LaFave, *Search and Seizure* § 4.5(a), at 209–10 (2d ed. 1987):

> In determining whether the description given the executing officer was sufficiently detailed, it is of course important initially to examine the description which appears in the warrant itself. However, if that description is inadequate, it is appropriate to look to the description appearing in the warrant application or affidavit *if* it is clear that the executing officers were in a position to be aided by these documents, as where

they were attached to the warrant at the time of execution and incorporated therein by reference. [The affidavit or application need not be attached to or incorporated into the warrant when the affiant is among the executing officers, however, because the affiant has personal knowledge of its contents and is therefore in a position to be aided by it. *See United States v. Gahagan*, 865 F.2d 1490, 1497 (6th Cir. 1989).] Under some circumstances, an insufficiency in the warrant description may be cured by facts known by the executing officer other than by examination of the affidavit. For example, it has been held that while ordinarily omission of the name of the city where the property is located is a fatal defect, this is not the case where the executing officer was also the affiant and the affidavit indicates that he had previously investigated personally the premises to which reference in the warrant was intended. [*See, e.g., State v. Smith, supra*.] But, this is not "to say generally that the personal knowledge of the officer executing the warrant, of the place intended to be searched, could cure a vitally deficient description, but merely, where as here, the error is at the worst innocent and technical, * * * such knowledge is an element to be considered." [*State v. Daniels*, 46 N.J. 428, 217 A.2d 610, 615 (1966).]

(Footnotes omitted.)

In *United States v. Vaughn*, 830 F.2d 1185, 1186 (D.C. Cir. 1987), a warrant described the vehicle to be searched as "'a Blazer 4X4 2 door Black in color with tinted windows bearing Maryland tags.'" The court referred to the affidavit, which stated "that appellant ran a drug distribution network from the 13th Street Variety Store . . ., that the Blazer was owned by appellant, and that the Blazer was used by appellant to deliver drugs." *Vaughn*, at 1186. The court concluded: "The affidavit fairly implies that the search was limited to a Blazer owned by appellant and located in the vicinity of the Variety Store. In fact, the Blazer was found within two hundred feet of the store very shortly after the issuance of the warrant." (Footnote omitted.) *Vaughn*, at 1186.

Here, too, it was implicit from the affidavit, and from a commonsense reading of the warrant, that the search was limited to a vehicle matching the description in the warrant, located near the duplex described, and driven, owned, or controlled by "Francisco". Detective Navarrete was able

to ascertain and identify the place intended. As the affiant, he knew probable cause was based on a nexus between the duplex, vehicle, and "Francisco" described in the warrant. There was no apparent threat he would stop any "newer white General Motors car with a temporary license sticker in the rear window". In fact, he proceeded to the duplex shortly after the warrant was issued, and only then looked for the vehicle and person described.

We hold that the vehicle description was sufficient because there was an implied connection between the vehicle, the duplex, and the person identified as "Francisco". Although it would have been preferable to make this connection explicit, by describing the vehicle as "a newer white General Motors car with a temporary license sticker in the rear window *located at or near the duplex, and driven owned, or controlled by Francisco*," the omission of the emphasized language was not fatal to the warrant.

We further hold that even if the vehicle description could be considered in isolation and deemed facially defective, Detective Navarrete relied in good faith on the issuing judge's approval of the warrant description, making the "good faith" exception to the exclusionary rule applicable. *See Massachusetts v. Sheppard,* 468 U.S. 981, 82 L. Ed. 2d 737, 104 S. Ct. 3424 (1984) (applying exception just announced in *United States v. Leon,* 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984)). In *Sheppard,* a detective conducting a murder investigation used a search warrant form for controlled substances because no other form was available. The detective crossed out "controlled substance" in the title of the form, but neglected to do the same in the warrant description, which on its face authorized a general search for controlled substances. The detective's affidavit of probable cause did not request a general search for controlled substances, and none were discovered in the search. The judge who signed the warrant told the detective he would make the necessary changes so as to provide a proper warrant. The Supreme Court held that when an officer who executes a search warrant knows

beforehand what items are to be seized, the officer is not "required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested." *Sheppard,* 468 U.S. at 989–90. That is the situation here. Any defect in the warrant description in this case is much less glaring than was the facial defect in *Sheppard.*

## PROBABLE CAUSE

Salazar contends there was no probable cause to believe a controlled substance would be found in his automobile. He notes Detective Navarrete's statement that persons trafficking in multiple–ounce quantities of cocaine "usually have a larger supply to draw from and would only transport quantities that were to be for immediate sale". There are several responses to this argument.

First, the judge issuing the search warrant was unaware of Detective Navarrete's statement. It was made in a subsequent affidavit requesting a warrant to search an apartment where Salazar and his girl friend lived. Salazar did not request a hearing to challenge the statement in the second affidavit as an intentional or reckless omission from the first affidavit. *See Franks v. Delaware,* 438 U.S. 154, 155–56, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978).

Second, the warrant authorized a search for more than cocaine or other controlled substances. The authorization also included "items used in the weighing, packaging, preparation and use of controlled substances along with items indicating dominion and control of the premise, records of sales, records of customers, money proceeds from the sale of controlled substances and weapons used to protect the money and controlled substances." Thus, whether cocaine would be found was not critical to the search of the car.

Third, the statement that cocaine traffickers transport quantities for immediate delivery does not diminish probable cause to believe cocaine would be found in Salazar's car *during a delivery.* The informant observed an attempted delivery by Salazar in his car at the duplex.

Thus, there was reason to believe Salazar would be attempting another delivery to the extent he could be observed in the car at the duplex in the near future.

■ Fourth, Detective Navarrete apparently believed the search was limited to a vehicle matching the description in the warrant, at or near the duplex, and driven, owned, or controlled by the person identified as "Francisco". This is how he proceeded and found the cocaine in Salazar's car. The judge issuing the warrant seems to have interpreted the warrant description in the same way as did Navarrete. This indicates that Navarrete's interpretation was both in good faith and objectively reasonable, triggering the "good faith" exception to the exclusionary rule, even if probable cause was lacking. *See United States v. Leon, supra.*

### Testimony That Search Was Pursuant to a Warrant

The trial court allowed the State to tell the jury the search of Salazar's car was pursuant to a warrant. Salazar contends this was an abuse of discretion because the warrant implied other illegal acts, and the existence of a warrant was not relevant to any issue before the jury. He analogizes to *State v. Cameron,* 100 Wn.2d 520, 531, 674 P.2d 650 (1983), where the court held that a murder victim's fear of the assailant could not be presented to the jury where insanity, not self defense, was the only issue at trial. Because the proffered evidence in *Cameron* implied prior aggressive conduct, and the evidence had no probative value, it was erroneously admitted.

Here, the trial court agreed that the legality of the search was not a trial issue, but doubted whether defense counsel's "perception of what might or might not be going on in the jury's mind" was "giving the jury its due." The court felt evidence of a search warrant, or some other justification for the search, was essential to prevent the jury from acquitting based on a belief "it's outrageous to just pull over a car, stop it and look under the seat for no reason whatsoever." Defense counsel did not argue that this concern was

unfounded or speculative. He did not propose some other way, such as an instruction or stipulation or alternative way for the State to proceed, that would have satisfied the trial court's concern.

In these circumstances, we cannot say that the trial court abused its discretion. The trial court reasoned that for the jury to exercise its constitutional prerogative to acquit intelligently, it had to know whether the police had a lawful basis to search Salazar's car. In this sense, evidence of a search warrant was of consequence and indeed critical to the outcome of the trial, assuming the jury was prepared to exercise its power of nullification. Therefore, to the extent the jury was so inclined, the evidence was relevant. *See* ER 401. In contrast, the evidence in *Cameron* served no legitimate purpose.

Additionally, the potential for prejudice in this case was slight. Defense counsel asked for a limiting instruction, and the court agreed to give one. At trial, the warrant was mentioned only in passing, and the circumstances supporting the warrant were not elicited. The passing reference to the search warrant did not necessarily imply to the jury that Salazar engaged in prior drug activity or other misconduct. The jury acquitted Salazar's girl friend, which suggests that it focused on the evidence presented at trial and not on an improper basis, such as criminal association. The slight potential for prejudice means that the probative value of the evidence was not "substantially outweighed by the danger of unfair prejudice". ER 403. Alternatively, it means that even if the evidence should not have been admitted, the error was not so prejudicial as to require reversal and a new trial.

### CONFIDENTIALITY OF INFORMANT

Defense counsel moved for disclosure of the confidential informant mentioned in the search warrant affidavit. Counsel noted controlled buys the informant made from someone named "Mike" at the duplex. This showed the informant had a cocaine source other than Salazar. Counsel

contended this was relevant on the issue of Salazar's intent to deliver. The court denied the motion for disclosure or for an in camera interview, saying there was no showing the informant had any information relevant or helpful to the defense.

The next day, during cross examination of Detective Navarrete, the court excused the jury for a sidebar on the scope of cross examination. The State requested the sidebar because defense counsel was asking general questions about the use of informants. Defense counsel referred to a conference in chambers earlier that morning, at which counsel had indicated that the defense believed one Marcos Melendez "quite possibly, if not probably, set up Mr. Salazar."[1]

At the sidebar, defense counsel recited for the record what he had said during the conference in chambers. Counsel explained that Melendez had borrowed Salazar's car the day before the search and had telephoned Salazar the next day, asking him to appear at the duplex. When Salazar arrived at the duplex, Melendez asked him to wait there for 10 minutes. Salazar left for a restaurant a few blocks away, saying he could be reached there. On the way, Detective Navarrete and the other officers stopped Salazar's car, searched it, and found the cocaine. With the assistance of an interpreter, Salazar testified to this effect at trial.

During the sidebar, the court said it had understood from the conference in chambers that defense counsel wanted to ask Detective Navarrete whether Melendez had been involved, not as an informant, but in some other way, such as whether he had used Salazar's car before the search. The

---

[1]At oral argument in this court, defense counsel said he did not speak extensively with Salazar until after the court's pretrial ruling denying disclosure of the confidential informant's identity. The lack of communication was due in part to Salazar's need for an interpreter. When an interpreter was obtained after the pretrial ruling, defense counsel learned for the first time of Salazar's stated belief that Melendez had set him up. There is nothing in the record which shows that this explanation was ever presented to the trial court. Therefore, we cannot fault the trial court for not considering it, although we can assume for purposes of our decision that it is accurate.

court added, "[U]nless I reconsider at this time, what I indicated is that I would draw the line at the question, was Mr. Melendez an informant in this case".

Defense counsel responded that he was "about 80 or 85 percent in agreement"; namely, that he "had understood and agreed in chambers . . . that it would be improper and not permissible . . . to ask this officer if Melendez was an informant in this case". Defense counsel wanted merely to elicit from the officer that an informant had provided information for the search warrant. Counsel said that "without going into the identity of the informant, I can bring out generally how informants are used, the type of information that's elicited from them and what use is made of that, and also the crux of the case, what's in it for the informants."

The court asked, "You are saying essentially, even without the identity of the informant being disclosed, if you can establish that an informant was used in this case, that's sufficient evidence from which you could argue that your client was set up, essentially?" Defense counsel responded, "Right."

The prosecutor argued that if the defense intended to explore that an informant had been used and relied upon by the officers executing the search warrant, the State should be allowed to present testimony about the informant as well, including what the informant said in the search warrant affidavit. The court agreed that if the defense was going to attack the credibility of the informant by suggesting that he provided false information to the police, the State would be allowed to rehabilitate the informant's credibility by showing exactly what he said to the police, including the information contained in the search warrant affidavit. However, the court felt that this line of inquiry would open "a can of worms" because then the defense might have a legitimate need to know the identity of the informant in order to respond to the State's rebuttal. The prosecutor agreed fully, expressing concern that the defense was proposing a situation which might eventually

require disclosure of the confidential informant without a preliminary showing of relevance.

Defense counsel countered, saying the problem was a matter of drawing an appropriate line between the competing concerns. The court agreed and decided to allow the defense to pursue the desired line of questioning without eliciting the informant's identity. In response, the State could rehabilitate the informant's credibility by showing the informant's track record and other relevant information, without eliciting specific hearsay allegations in the affidavit. At this point, the following exchange occurred:

[PROSECUTOR:] That seems like a reasonable compromise, I think.

THE COURT: [Defense counsel], is that clear now?

[DEFENSE COUNSEL:] That's fine.

THE COURT: Let's have the jury, then, and see if we can get finished with this witness.

Our analysis begins with the proposition, which Salazar does not dispute, that the State has a qualified privilege not to disclose the identity of confidential informants, and that disclosure is required only when the informant's identity is relevant and helpful to the defense or essential to a fair determination of the charge. *See Roviaro v. United States,* 353 U.S. 53, 60–61, 1 L. Ed. 2d 639, 77 S. Ct. 623 (1957); *State v. Thetford,* 109 Wn.2d 392, 396, 745 P.2d 496 (1987); CrR 4.7(f)(2); RCW 5.60.060(5). Generally, the preferred procedure for making this determination is an in camera hearing. "No hearing is necessary, however, if the accused's reasons for seeking the informant's testimony are only speculative, though the hearing judge should take into consideration the difficulty of explaining in a vacuum why the testimony is crucial." *State v. Cleppe,* 96 Wn.2d 373, 382, 635 P.2d 435 (1981), *cert. denied,* 456 U.S. 1006 (1982); *see State v. Fredrick,* 45 Wn. App. 916, 921, 729 P.2d 56 (1986) (no error in denying motion for in camera hearing).

In this case, the initial reason for seeking disclosure was inadequate. Even if the informant had a source of cocaine other than Salazar, this does not tend to disprove the crime charged. Salazar was in apparent possession of cocaine on

the night in question, and his intent to deliver was established by the packaging of the cocaine in 10 separate baggies. However, the defense may have articulated a legitimate reason for seeking disclosure at the subsequent conference in chambers, assuming the informant was Melendez. If Melendez was the informant, his use of Salazar's car and request that Salazar appear where the police were expecting him corroborates the setup defense. The defense elicited testimony that some informants seek personal advantage by implicating others, perhaps falsely; thus, the informant in this case might have had a motive to frame Salazar. The informant had an opportunity to do so because he had a source of cocaine and, if he was Melendez, he had access to Salazar's car hours before the police found the cocaine under the driver's seat.

■ We need not decide whether defense counsel ultimately laid an adequate foundation for either an in camera hearing or disclosure of the identity of the confidential informant. Although defense counsel initially requested an in camera hearing or disclosure, we hold that he waived this request in several respects. First, he did not renew it when the court expressed its apparent willingness to reconsider the issue. Because the court was open to reconsideration, it is immaterial that the court initially decided not to allow the defense to ask if Melendez was the informant.

Second, the court understood from the conference in chambers that defense counsel wanted to ask not whether Melendez was the informant but such questions as whether Melendez had used the car before the search. Defense counsel said he was "about 80 or 85 percent in agreement" and, specifically, that he had "understood and agreed in chambers" that it would not be proper to ask if Melendez was the informant. The area in disagreement concerned defense counsel's desire merely to ask Detective Navarrete if an informant had been used to obtain the search warrant. Defense counsel said he could present the setup defense adequately if this desire were satisfied, without asking about the identity of the informant. This led the trial court

to believe that disclosure of the identity of the confidential informant was unnecessary.

Finally, defense counsel said the problem was simply a matter of drawing an appropriate line, inviting the court to make a compromise ruling. The court accepted the invitation and allowed defense counsel to pursue its stated line of questioning, while at the same time refusing to permit the State to respond as fully as it wished. The State characterized the ruling as "a reasonable compromise", and defense counsel said, "[t]hat's fine", as if perceiving that the compromise was favorable to Salazar.

Arguably, defense counsel simply meant that the court's ruling was clear and that he felt he had to abide by it even though he was dissatisfied. However, we do not interpret counsel's words so narrowly in view of the context in which they were uttered and the fact that on their face they indicate apparent satisfaction with the compromise reached by the court. Further, defense counsel continued to argue adamantly even after the court's initial ruling, which suggests that counsel was not resigned to it, and the court expressly noted in passing that its decision was not final but open to reconsideration.

Also, the court's ruling did not prevent defense counsel from subpoenaing Melendez for examination as a hostile witness. The defense suggests that it was unable to locate Melendez, and did not even know how to attempt to do so. However, in the absence of evidence to the contrary, we assume the prosecutor knew the informant's address, or how to locate him, and that a subpoena could have been served upon him. Use of a subpoena, if necessary, would have enabled defense counsel to inquire into Melendez's purpose in borrowing Salazar's car the day before the search and in requesting Salazar's presence at the place of the search. Counsel could have asked whether Melendez ever served as an informant; if so, whether he was ever paid or received anything for doing so; and whether any charges were pending against him on June 28, 1988. The State would have been obliged to disclose to the defense any facts

which would have impeached Melendez's response. *See* CrR 4.7(a)(3); *United States v. Bagley,* 473 U.S. 667, 676–77, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985), rejecting distinction between exculpatory and impeachment evidence for purposes of *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

Although Melendez presumably would have denied planting the cocaine in Salazar's car, he might have been impeached, the effect of which could have been the same as if he admitted setting up Salazar. Further, we believe that if the defense had pursued this strategy, and if Melendez had testified in a manner that tended to corroborate the setup defense, the trial court would have been satisfied that a sufficient foundation had been laid to permit the defense to ask if Melendez was the confidential informant.

Defense counsel probably elected not to subpoena Melendez, if this was necessary to call him as a witness, because if he was the informant, the State could have used him to impeach Salazar's testimony. Salazar testified that he never used or sold drugs, which is flatly contrary to what the informant told Detective Navarrete. This strongly supports the waiver theory, including waiver of cross examination.

We have held that a defendant who fails to call an available hearsay declarant waives an objection under the confrontation clause to admission of the hearsay. *See State v. Borland,* 57 Wn. App. 7, 12, 786 P.2d 810 (1990). Similarly, defense counsel's failure to call Melendez, who we assume was available absent persuasive evidence to the contrary, waived any confrontation clause objection.

Further, we have held that disclosure of a confidential informant's identity is unnecessary when the defendant could call a witness of his own to achieve the same purpose that disclosure purportedly would serve. *See State v. Vargas,* 58 Wn. App. 391, 397–98, 793 P.2d 455 (1990); *State v. Uhthoff,* 45 Wn. App. 261, 270, 724 P.2d 1103, *review denied,* 107 Wn.2d 1017 (1986). As noted

above, the defense could have used Melendez to corroborate the setup defense, if it had merit, and we believe the trial court would have permitted defense counsel to ask if Melendez was the informant if counsel had successfully done so. We are left to assume that the defense deliberately avoided calling Melendez as a witness because of a fear that his testimony would be damaging to Salazar. In other words, the defense had a choice between presenting Salazar's unimpeached testimony before the jury and presenting a setup defense based on the theory that Melendez was the informant, with Detective Navarrete verifying that Melendez was the informant, if in fact that was the case. The defense could not have it both ways. Having chosen the former strategy and discovered that it did not result in an acquittal, the defense apparently seeks to choose the latter strategy. This may not be done. Arguments and strategic decisions must be made in the trial court, "not saved for an appeal that would follow a lost gamble on the verdict." *State v. Trader,* 54 Wn. App. 479, 486, 774 P.2d 522, *review denied,* 113 Wn.2d 1027 (1989).

The conviction is affirmed.

SWANSON and FORREST, JJ., concur.