# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

STATE OF WASHINGTON,

                Respondent,

       v.

MATTHEW MCCOLLIAN,

                Appellant.

No. 83284-1

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — Matthew McCollian appeals his convictions of murder in the second degree, unlawful possession of a firearm in the second degree, and arson in the second degree. McCollian claims that (1) the trial court failed to grant a mistrial after erroneously admitting text messages from the deceased to her mother, (2) testimony that McCollian had a handgun five days prior to the murder violated ER 404(b), (3) a police officer testifying to the existence of a perjury statement on a form signed by McCollian improperly commented on his credibility, and (4) the accumulation of errors affords him a new trial. The trial court incorrectly concluded an ER 404(b) analysis did not apply, but any error was harmless. We find no other error.

However, we accept the State's concession that McCollian is entitled to resentencing with a reduced offender score that comports with State v. Blake,

Citations and pin cites are based on the Westlaw online version of the cited material.

197 Wn.2d 170, 481 P.3d 521 (2021). Because we cannot determine if the trial court intended to impose community custody supervision fees, the parties can clarify that issue at resentencing. We affirm the convictions but remand for resentencing.

FACTS

In December 2018, Sophia Stutzman and her mother, Chanelle Livingston, lived with Stutzman's fiancé in Monroe, Washington. On December 11, Stutzman asked Livingston to take her to go see McCollian at his apartment in Everett. Livingston knew McCollian as someone who was "interested in seeing" Stutzman, but she was unsure if they had a romantic relationship. Livingston drove Stutzman to McCollian's apartment in Everett at around 9:00 p.m. Livingston saw McCollian greet Stutzman halfway up a stairway, they waved to Livingston, and Livingston left to go to her friend's house. Livingston had planned to stay at her friend's until Stutzman needed a ride home.

At around 11:30 p.m. or 12:00 a.m., Livingston noticed that she had a missed call from Stutzman. Accordingly, Livingston left to pick Stutzman up from McCollian's apartment. During that time, Stutzman and Livingston exchanged multiple text messages, where Stutzman expressed fear, her desire to leave, and her observations about McCollian's behavior. Stutzman stopped responding to Livingston at around 1:05 a.m. Livingston waited for Stutzman in McCollian's apartment complex parking lot, eventually knocking on the door with no response and subsequently leaving.

2

About 3:20 a.m. on December 12, 2018, Stutzman's body was found face down in a road behind Costco in Tumwater, Washington. A pathologist concluded the cause of death was a gunshot wound to the chest. The bullet had entered just underneath her collarbone on the left side and exited her right arm, piercing both her left lung and aorta. The bullet had exited her body. The pathologist characterized the gunshot wound as "an indeterminate range gunshot wound," which he described as normally being between 18 and 24 inches. An analysis of a vaginal swab from Stutzman disclosed the presence of semen that matched with McCollian's deoxyribonucleic acid (DNA) profile along with the DNA of another man.[1]

Cell phone tower records for both Stutzman's and McCollian's cell phones showed that both phones were pinging off cell phone towers in the same general areas along I-5 southbound from 2:21 a.m. to 6:56 a.m. on December 12. McCollian's cell phone pinged in Tumwater near Costco at 3:15 a.m., south of Chehalis at 3:57 a.m., and La Center at 5:56 a.m. Cell phone tower records then showed McCollian's cell phone heading back north. The records also showed that Stutzman's phone was near McCollian's apartment when she was text messaging with Livingston. Stutzman's phone was located in a garbage can in Renton.

---

[1] The forensic scientist explained that "it was 400 octillion times more likely to observe that mixed DNA profile if it originated from [Stutzman], [McCollian], and an additional unknown contributor rather than [Stutzman] and two unrelated individuals selected at random in the U.S. population."

3

Detectives later discovered that McCollian's bank card was used to make a withdrawal on December 12, 2018, at around 12:30 a.m. The video and bank records of the withdrawal correlated with a withdrawal receipt that was located in a white Toyota Camry McCollian had rented. The bank records also showed a transaction at the ARCO station in Centralia, Washington, at around 6:58 a.m. on December 12, 2018.

On December 15 at 7:52 a.m., McCollian called the police and reported that his rental vehicle, a white Toyota Camry, was stolen. McCollian told the officer that "he couldn't remember where he had rented it from." Later, McCollian went into the police department to make a formal report and provided his keys. He told the officer that he rented the vehicle the previous Monday. He said that he had been on a date the night before and came back to the hotel and parked the car in the hotel parking lot in a handicapped stall but then moved it onto the side of the road. He first told the officer that he noticed it was stolen sometime after midnight, and then later told the officer he noticed it was stolen at 2:00 a.m. He stated he was going to the car in order to bring his date home.

McCollian completed a police vehicle theft report form that contained a perjury statement and a consent to have law enforcement search the vehicle.

The officer who took the report then located the vehicle near the same hotel where McCollian had stayed. When the officer inspected the vehicle, he observed that there was soot all over the inside of the car. He found fire damage and two gas cans in the front passenger seat area.

4

The officer called McCollian about 15 to 20 minutes after he had seen him last and told him he located the vehicle. The officer asked McCollian if he would come meet him, but McCollian's response was that he was busy. The officer asked him where he was and what he was doing, but McCollian said it did not matter and became increasingly defensive. The officer suggested that it did not seem to be a random act, and that McCollian might actually know the person who had done it. McCollian did not appreciate the accusations and got increasingly "sort of aggressive and defensive on the phone." The officer reminded McCollian that making a false police report is a crime, and McCollian indicated that he did not want to speak with him anymore.

The hotel where McCollian was staying had surveillance video that showed he had checked into the hotel at 1:52 a.m. on December 15 and checked out at 10:40 a.m. that morning. He did not list his car with the hotel as the Toyota Camry that was stolen but as a Honda Element.

Detectives impounded the Camry and conducted an investigation. A cigarette butt that was smoked a little more than half sat on the center console, and a motorcycle helmet sat on the back seat. A one-gallon gas can sat on the front passenger seat that was burned, and another gas can on the floor appeared untouched by the flames with a puncture on the side of it. The majority of the fire damage occurred in the front passenger seat.

A fire marshal inspected the vehicle and found there was "minimal damage, because [the fire] was confined to the interior of the vehicle. . . ." He indicated that the fire was an "oxygen-deprived fire" that "starved itself out." He

5

concluded that the "fire [w]as an intentionally set incendiary fire" that was "set by a hand-held open flame."

A forensic examination of the car discovered blood on the passenger side of the center console, the front vertical portion of the center console, the front passenger side floorboard, above the glove box door, and the interior surfaces of the glove box door. A DNA analysis of the blood from the vehicle glove box resulted in a match to Stutzman's DNA.

Investigators also found evidence of the firing of a handgun inside the vehicle. They found (1) an empty 9mm Luger cartridge case, commonly referred to as a "shell," on the rear driver's side floorboard, (2) a bullet-impacted passenger seatbelt and strap, (3) a bullet defect in the passenger side B pillar[2] (4) a fired bullet in between that B pillar cover and the B pillar, and (5) a dent in that B pillar. A forensic scientist concluded that it was likely that one shot was fired inside the vehicle, the general direction the bullet traveled was likely from the driver's side to the passenger side, Stutzman's wound was consistent with the bullet trajectory, and that "the female subject was likely sitting in the front passenger seat when she was shot."

The State charged McCollian with intentional murder in the second degree or in the alternative felony murder in the second degree predicated on assault, unlawful possession of a firearm in the second degree, and arson in the second

---

[2] The B pillar refers to the structural framing of the vehicle between the two doors where the seatbelt is located.

degree.  The State also sought a deadly weapon enhancement and domestic violence aggravator on the murder charges.

At trial, defense counsel's opening statements suggested the defense theory would revolve around the fact that Stutzman and McCollian used drugs, and when they traveled south together, something went wrong causing McCollian to flee.  Counsel told the jury Stutzman "had a drug addiction," and McCollian "also ha[d] a drug addiction."  Counsel stated the two left the area together heading south to Costco, and "for some reason they wanted to be at that back parking lot at 3:00 a.m."  When "something went wrong in that back area of Costco," Stutzman was shot and McCollian "fled that area quickly" "trying to get away."

McCollian objected to the introduction of text messages from Stutzman to Livingston as inadmissible hearsay.  The following is the text message conversation at issue:

Livingston: "R u okay"
"Sorry missed your text"
"I'm stopping by Lynnwood then to you okay"

Stutzman: "Mom?"
"I need to leave"
"Now"
"He is smoked out"
"He's scaring me"

Livingston: "I'm a exit away"
"Have Ashley with me we have to drop her off it's on way"
"Here"

Stutzman: "Ok don't let her see where he lives park way down"
"Be out in a couple mins"

7

Livingston:   "I'm across next to van"

Stutzman:     "Ok he is so out of his mind one sec please wait a sec"

Livingston:   "Of course"
              "I can't be patk like this please let's go"

Stutzman:     "Ok coming"


Livingston:   "Car is trippin"
              "C'mon"

Stutzman:     "I'm coming"

Livingston:   "I'm parked to the right in left by blk truck"

The court ruled on the admissibility of each phrase and, initially, admitted all the text messages. We discuss the basis for the rulings below.

During Livingston's testimony, the State asked Livingston if Stutzman had ever previously described McCollian as "smoked out" or "out of his mind." Livingston said Stutzman had not referred to McCollian in that way previously. On defense's re-cross, defense counsel asked Livingston, "[D]o you think or do you know if [Stutzman] was going over to his home that night to get high together?" Livingston responded that she did not know. The prosecution objected and argued that the drug use by both the defendant and the victim potentially has "kind of inherent prejudicial effect" under ER 403.

After a recess, the court expressed concern about admitting evidence of drug use on the part of the defendant. The court also stated it was concerned with the previous text message admission that McCollian was "smoked out." The court ruled it was striking the "He is smoked out" statement from the record, including ordering the parties to redact it from an admitted exhibit of that text

8

message. The court also ruled it was striking the question that asked Livingston if Stutzman had ever previously described McCollian as "smoked out" or "out of his mind," as well as Livingston's answer. The court informed the parties it planned to issue a curative instruction to the jury. The court further precluded the parties from introducing any further evidence of drug usage on the part of the defendant or Stutzman.

After the court's ruling that the text "He is smoked out" should not have previously been admitted, McCollian moved for a mistrial, arguing, "I don't think we can unring that bell." The prosecution responded that "a curative instruction can be given." The trial court denied the motion for mistrial. The court then instructed the jury:

> The Court is striking from evidence the portion of Exhibit No. 36. You may recall that's one of the alleged text message communications between the alleged victim and this witness. The comment, quote, "He is smoked out." That is stricken from evidence.
> Furthermore, the question, "Had she ever described him on any prior occasion as being 'smoked out' or 'out of his mind,' anything like that?" And the answer, "No." That is stricken from the evidence.
> And, as you know, as I previously advised you after you were administered the second oath and sworn in as jurors, when I strike evidence, that means you should not consider it in your deliberations, even though you may have heard or seen that evidence.

The parties redacted Exhibit No. 36 as ordered by the court.

Defense also objected to the State introducing testimony of Jonathan Thomas regarding witnessing McCollian possessing firearms in his apartment five days before the murder. The State explained Thomas would testify that McCollian "displayed for him three firearms, two what [the Prosecutor

9

understood] to be more long guns, but one pistol that was identified to him as a Glock, Glock hand gun." Defense counsel argued that this evidence would be governed by ER 404(b). The prosecutor disagreed and stated:

> Our sole purpose of offering this is because it has direct relevance because it is close in time to the homicide and demonstrates that the defendant had access to a weapon that at least could be consistent with the one used in this case based on what we know, a firearm, and, in particular, a pistol.

The court replied, "The Court does not consider this proffered evidence as evidence offered by the State pursuant to or in relation to Evidence Rule 404(b)." Instead, the court stated that "the proper analysis is pursuant to Evidence Rule 403 and 401 and 402." It then proceeded with its analysis, first deciding that Thomas' observation of McCollian in possession of a handgun within five days of the incident was relevant evidence. It then conducted an ER 403 balancing test, deciding to limit Thomas' testimony to his observation of McCollian with a handgun and not long weapons.

Thomas testified that on about December 4, he went over to McCollian's apartment and that McCollian showed him a "pistol" that he described as a "Glock." The court gave a limiting instruction proposed by the defense:

> Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of the testimony of [Thomas]. You are not to consider the testimony of [Thomas] as it relates to whether or not the Defendant possessed a firearm, as charged in Count 2. Any discussion of the evidence during your deliberations must be consistent with this limitation.

Count II was the charge for unlawful possession of a firearm in the second degree. The parties stipulated that McCollian had previously been convicted of a felony and the trial court read the stipulation to the jury.

Defense counsel argued a defense theory in closing consistent with its suggested theme from its opening statement. Defense counsel told the jury that Stutzman and McCollian were in a car going to Tumwater, which was a two-hour trip. She explained, "People don't get in their car and go to Tumwater - - hey, let's go to Tumwater - - when they are from Everett and they have no ties." She stated that there was a purpose, but the purpose was unclear, because "you don't get in the car for two hours for no reason at 1:00, 1:30 in the morning after standing up your mom. Something had to propel them. There had to be a purpose, but we don't know what it is." She indicated that Stutzman had $140 cash, and despite having no ties to Tumwater, "somehow, conveniently, they find a place in Tumwater that's on a road in an area where there's no surveillance camera coverage." Defense counsel mused "is it more reasonable that they were directed there by somebody else and that they had a purpose for going there? We don't know who they were meeting. We don't know why they were meeting." Defense counsel argued that McCollian failing to call the police could be explained by the possibility that they were in Tumwater for an "illegal purpose." The jury found McCollian guilty on all counts.

At sentencing, the parties argued whether McCollian's California conviction of unlawful possession of a controlled substance should be counted toward his offender score. The trial court found the out-of-state conviction comparable, and it was included in McCollian's offender score. The court imposed a high-end sentence of 357 months in addition to a 24-month deadly weapon enhancement amounting to 381 months, with 43 months for unlawful

possession of a firearm and 70 months on the arson in the second degree charge to run concurrently. McCollian appeals.

DISCUSSION

Text Messages

McCollian first contends that the trial court erred in admitting Stutzman's text messages to her mother on the night of the incident because they were inadmissible hearsay.[3] We disagree.

Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. ER 801(c); ER 802. A statement can be written, but it must be intended as an assertion by the person making it. ER 801(a). Hearsay is not admissible unless it falls under an exception. ER 802; ER 803. "Whether a statement is hearsay depends upon the purpose for which the statement is offered. Statements not offered to prove the truth of the matter asserted, but rather as a basis for inferring something else, are not hearsay." State v. Crowder, 103 Wn. App. 20, 26, 11 P.3d 828 (2000). The trial court has great discretion in determining the admissibility of evidence, and its ruling will be reversed only upon a showing of manifest abuse of discretion. Id. at 25. Abuse of discretion occurs when the court's decision is "manifestly unreasonable or based upon untenable grounds." Id. at 25-26.

---

[3] On appeal, McCollian only provides argument regarding the specific text messages addressed in this opinion. We decline to address any other text messages between Stutzman and Livingston that were admitted by the trial court because McCollian does not provide a supportive substantive argument. RAP 10.3(a)(6).

*A. "He's scaring me"*

Over defense objection, the trial court admitted the text message, "He's scaring me" as a state of mind exception to hearsay. McCollian claims Stutzman's state of mind was not relevant unless the case involved a particular defense theory such as accident or self-defense, which was not at issue.

ER 803(a)(3) provides, "A statement of the declarant's then existing state of mind, emotion, sensation or physical condition. . ." is not excluded by the hearsay rule. The state of mind exception applies (1) if there is some degree of necessity to use out-of-court, uncross-examined declarations, and (2) if there is circumstantial probability of the trustworthiness of the out-of-court, uncross-examined declarations. State v. Parr, 93 Wn.2d 95, 98-99, 606 P.2d 263 (1980).

McCollian relies on Parr and State v. Cameron, 100 Wn.2d 520, 674 P.2d 650 (1983). In Cameron, where the defense's theory was insanity, the court held that hearsay testimony from the victim's relatives indicating that the victim told them prior to the incident that she was having problems with the defendant and feared him, was not admissible under the then existing state of mind exception because "the victim's state of mind itself was not relevant to any material issue before the jury. At best, it bears only a remote or artificial relationship to the legal or factual issues actually raised and thus was inadmissible." Cameron, 100 Wn.2d at 531. Insofar as the defense theory in Cameron was insanity, that case is inapposite. However, even the Cameron court recognized that the question of whether a victim's state of mind is relevant depends on material issues before the jury. Id. at 531.

The Parr court stated, "In a homicide case, if there is no defense which brings into issue the state of mind of the deceased, evidence of fears of other emotions is ordinarily not relevant." Parr, 93 Wn.2d at 103. Further, it stated, "But where a defense such as that of accident of self-defense is interposed, as is the case here, courts have generally allowed the admission of the victim's fears, as probative of the question whether that person would have been likely to do the acts claimed by the defendant." Id. at 103. In Parr, the court determined that because the defense's theory of the case was accident, "the trial court should allow the State to prove the victim's declarations about his or her own state or mind, where relevant, but should not permit it to introduce testimony which describes conduct or words of the defendant." Id. at 104.

While Parr involved a defense theory of accident, the Parr court's holding did not expressly restrict admissibility to cases where the defense was accident or self-defense. In fact, the Parr court recognized that a defense can bring "into issue the state of mind of the deceased," and that courts should consider whether the issue is "probative of the question whether that person would have been likely to do the acts claimed by the defendant." Id. at 103.

In the instant case, the defense's opening statement painted a picture of Stutzman and McCollian as two drug addicts who left the area together heading south to Costco, and "for some reason they wanted to be at th[e] back parking lot at 3:00 a.m." when "something went wrong in th[e] back area of Costco." Stutzman gets shot and McCollian "fled th[e] area quickly" "trying to get away." The defense theory created a material issue as to whether Stutzman would

14

voluntarily leave with McCollian to head to the back of Costco in Tumwater around 3:00 a.m. Thus, Stutzman stating that McCollian was scaring her suggested that her state of mind at that time was such that she would not have likely voluntarily gone with McCollian to Tumwater.

Under these facts, Stutzman's state of mind was relevant and material. The trial court did not abuse its discretion in admitting the text message, "He's scaring me."

B. *"He is so out of his mind"*

The trial court, over defense objection, admitted Stutzman's text message, "Ok he is so out of his mind. One sec, please wait a sec," under the present sense impression exception to hearsay.

Statements that are present sense impressions, describing or explaining an event or condition while the declarant was perceiving the event or condition, or immediately thereafter, are not excluded as hearsay. ER 803(a)(1). McCollian incorrectly cites Parr and Cameron for the proposition that the victim's present sense impressions are irrelevant in a homicide case unless a specific defense places the decedent's state-of-mind in issue. Neither Parr nor Cameron addressed the present sense impression exception. McCollian cites no other authority and makes no argument as to why the text message does not qualify as present sense impression.

The court did not abuse its discretion when it admitted the "he is so out of his mind" text message as a present sense impression hearsay exception.

15

*C. "He is smoked out"*

McCollian further contends that the trial court erred when it denied McCollian's motion for a mistrial after the jury heard testimony that Stutzman sent the text message, "He is smoked out."

The denial of a mistrial motion is reviewed for abuse of discretion. State v. Rodriguez, 146 Wn.2d 260, 45 P.3d 541 (2002). A trial court abuses its discretion in denying a motion for a mistrial only if its decision is manifestly unreasonable or based on untenable grounds. State v. Allen, 159 Wn.2d 1, 10, 147 P.3d 581 (2006). In considering whether a motion for mistrial should have been granted, the reviewing court considers (1) the seriousness of the claimed irregularity, (2) whether the information imparted was cumulative of other properly admitted evidence, and (3) whether admission of the illegitimate evidence can be cured by a jury instruction. State v. Escalona, 49 Wn. App. 254, 255, 742 P.2d 190 (1987).

Here, the fact that the jury heard that McCollian was smoked out was not a serious irregularity in context of the whole trial. Defense counsel described Stutzman as a drug addict and implied that Stutzman and McCollian were going to Tumwater for an "illegal purpose." Defense counsel also stated in their opening statement that after the events in Tumwater, McCollian "tried to stay high." Evidence of McCollian's drug use was consistent with the defense's theory. The trial court struck the text message from the evidence as well as other references in evidence suggesting drug usage by McCollian. Further, the trial court properly delivered a curative instruction to the jury.

The trial court did not abuse its discretion in denying the defense's motion for a mistrial.

### Handgun Testimony

McCollian also contends that the trial court erred when it admitted Thomas' testimony that McCollian had a handgun five days before Stutzman's death because it was propensity evidence under ER 404(b). McCollian was charged with unlawful possession of a firearm and the parties stipulated that McCollian had a previous felony conviction.

We first address whether the trial court erred by concluding it need not conduct a ER 404(b) analysis because the State was offering the evidence for a purpose other than propensity.

ER 404(b) "is a categorical bar to admission of evidence for the purpose of proving a person's character and showing that the person acted in conformity with that character." State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). ER 404(b) expressly applies to "[e]vidence of other crimes, wrongs, or acts." Such evidence may be admissible for "other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

While the other purposes are sometimes referred to as "exceptions," they are not exceptions to the rule. 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 404.9, at 497 (6th ed. 2021). Instead, there is one improper purpose and multiple undefined proper purposes for which the evidence can be admitted. Gresham, 173 Wn.2d at 420. "Only when the term 'exception' is read out of

context and the plain text of ER 404(b) is ignored does the possibility of confusion arise." Id. at 421.

> Washington courts have developed a thorough analytical structure for the admission of evidence of a person's prior crimes, wrongs, or acts. To admit evidence of a person's prior misconduct, 'the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'

Id. (quoting State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). "The third and fourth elements ensure that the evidence does not run afoul of ER 402 or ER 403, respectively. The party seeking to introduce evidence has the burden of establishing the first, second, and third elements." Gresham, 173 Wn.2d at 421. "It is because of this burden that evidence of prior misconduct is presumptively inadmissible." Id.

In the instant case, defense counsel argued that ER 404(b) governed the admissibility of evidence of McCollian's prior handgun possession. The State disagreed, explaining that the "sole purpose" of offering the evidence is to demonstrate that McCollian "had access to a weapon that at least could be consistent with the one used" to kill Stutzman. The trial court agreed with the State stating, "The Court does not consider this proffered evidence as evidence offered by the State pursuant to or in relation to Evidence Rule 404(b)." Instead, it engaged in an analysis pursuant to ER 403, 401, and 402. But the State providing another purpose as to why it was offering the evidence did not remove the danger of introducing presumptively inadmissible prior misconduct. The trial

18

court incorrectly concluded that an ER 404(b) analysis did not apply.[4]  It did, however, conduct a balancing test on the record.

The court found the evidence probative because the issue "appears to be who fired the gun, and it is relevant that, four or five days prior [to] this incident, it is alleged that Mr. McCollian was in possession of a handgun.  So it's highly probative."  In balancing the prejudicial effect, the trial court did not appear to articulate anything more than a conclusory statement.  The court reasoned, "Frankly, the Court doesn't see any prejudice to the defendant.  Clearly – let me rephrase that, an unfair prejudice to the defendant.  Clearly it's prejudicial.  It's harmful to the defendant, but it's not unfairly – and the Court, for purposes of the record emphasizes the term 'unfairly' – prejudicial to Mr. McCollian."

"Although evidence of weapons entirely unrelated to the crime is inadmissible, if the jury could infer from the evidence that *the weapon* could have been used in the commission of the crime, then evidence regarding the possession of *that weapon* is admissible."  State v. Luvene, 127 Wn.2d 690, 708, 903 P.2d 960 (1995) (emphasis added).

McCollian cites State v. Hartzell for the proposition that the evidence was not admissible because the State did not establish that the handgun Thomas witnessed was the handgun used to shoot Stutzman.  153 Wn. App. 137, 221 P.3d 928 (2009).  In Hartzell, defendants were convicted of armed assault and unlawful possession of a firearm for shooting into an apartment occupied by a

---

[4] The court did not determine, as part of an ER 404(b) analysis, whether, by a preponderance of the evidence, the misconduct occurred.  McCollian does not challenge on this basis.

woman and her daughter.  Id. at 145.  "Investigators were able to link [the defendants] to the crime by establishing that the guns they possessed in two separate incidents were the same guns used to shoot into the apartment."  Id.

Unlike the gun evidence in Hartzell, the handgun testimony in the instant case did not allow for even a reasonable inference that the handgun Thomas saw McCollian possess was the same gun that was used to kill Stutzman.  Even the State explained that it was proof that McCollian had access to a weapon that "at least could be" consistent with the one used.  The State could not even argue that the gun *was* consistent with the one used because no evidence linked the type of handgun Thomas saw with the type of handgun that was actually used to kill Stutzman.

We question whether the jury could reasonably infer from the evidence, that the handgun Thomas saw McCollian possess, could have been the handgun used in the commission of the crime.  The probative value of the Thomas testimony was, at most, extremely low.  And if the handgun was completely unrelated to the crime, the concern for prejudice is high.  "Evidence of weapons is highly prejudicial, and courts have 'uniformly condemned . . . evidence of . . . dangerous weapons, even though found in the possession of a defendant, which have nothing to do with the crime charged.' "  State v. Freeburg, 105 Wn. App. 492, 501, 20 P.3d 984 (2001).

Regardless, any error in the trial court for not conducting an ER 404(b) analysis and admitting the Thomas testimony was harmless.  "It is well settled that the erroneous admission of evidence in violation of ER 404(b) is analyzed

20

under the lesser standard for nonconstitutional error." Gresham, 173 Wn.2d at 433. The question, then, is whether, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected. Id.

McCollian relies on Freeburg to argue admission of the handgun testimony was not harmless. In Freeburg, this court held that the trial court erred by admitting evidence that the defendant possessed a handgun at the time of arrest around three years after the charged crime of murder for the purpose of showing flight and demonstrating consciousness of guilt. 105 Wn. App. at 500-01. Nothing connected the handgun found in 1997 to the victim's death in 1994. Id. at 501. At trial, the jury heard conflicting testimony as to who had the gun involved in the altercation. Id. at 495-96. The State's key witness was the victim's girlfriend. Id. at 495. Freeburg testified that he acted in self-defense. Id. at 496. The court could not characterize the admission of the gun as harmless absent a limiting instruction. Id. at 502. The court reasoned that "jurors could well have regarded the evidence Freeburg had a gun when arrested not as further evidence of flight but rather as tending to show he was a 'bad man,' or had a propensity to carry guns, or was likely to have brought a gun [to the scene of the crime]." Id. at 502.

The evidence of the underlying crime in Freeburg is far different than the evidence against McCollian. The jury in Freeburg had to decide which witness to believe and had conflicting explanations of what happened.

In the instant case, a substantial amount of undisputed evidence in the record supports McCollian's convictions. McCollian argues that without the testimony from Thomas, "there would have been no evidence of any gun aside from the evidence of the shooting death itself." But the evidence of the shooting death connected McCollian. McCollian did not dispute that he rented the Toyota Camry and that he drove it with Stutzman the morning Stutzman was murdered. Forensic evidence concluded Stutzman was likely shot while sitting in the front passenger seat of that car. Detectives found a casing and a fired bullet in the B pillar of the car that was consistent with the trajectory of the gunshot that killed Stutzman. The jury could find that Stutzman would not have gone willingly with McCollian, given her state of mind at the time she wanted to leave McCollian's apartment. Phone records and hotel security video provided circumstantial evidence that McCollian drove the Camry south with Stutzman, dumped her body and drove the Camry back. A jury could find that McCollian burned the Camry and later reported it stolen as an attempt to destroy evidence of the murder.

It is not reasonably probable that the outcome of the trial would have been materially affected if Thomas' handgun testimony had been excluded.

### Credibility Comment

McCollian contends that a police officer commented on McCollian's credibility, invading McCollian's right to a fair and impartial jury. We disagree.

Generally, no witness may offer testimony in the form of an opinion regarding the guilt or veracity of the defendant. State v. Kirkman, 159 Wn.2d 918, 927, 155 P.3d 125 (2007). Such testimony is unfairly prejudicial to the

defendant because it invades the exclusive province of the jury.  Id.  In determining whether testimony amounts to impermissible opinion testimony, courts consider the type of witness involved, the specific nature of the testimony, the nature of the charges, the type of defense, and the other evidence before the trier of fact.  State v. Demery, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001).  In State v. Jones, this court concluded that an officer's statement that the defendant was lying was improper opinion testimony.  117 Wn. App. 89, 91-92, 68 P.3d 1153 (2003).  "Testimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony."  City of Seattle v. Heatley, 70 Wn. App. 573, 578, 854 P.2d 658 (1993).

In the instant case, the officer described the form that McCollian filled out when McCollian reported the theft of his Toyota Camry.  The officer stated, "There's the perjury statement on there that we always have the person read.  Basically, it says that you're not making a false preliminary report, that you understand that making a false police report is a crime."  After the defense objected on the basis of improper testimony and veracity of a witness, the prosecutor explained, "I'm not planning to ask him any questions about anybody's veracity.  He was just noting what the form had printed on it."  The court overruled the objection, and the officer continued, ". . . perjury is also a crime, that's kind of the gist of it."

The officer never made a direct comment on McCollian's veracity.  His testimony included statements of fact including a description of the perjury

statement on the police report, a description of how he reminded McCollian about the perjury statement he signed after the vehicle was found, and a description of McCollian's demeanor and reactions. None of this testimony was improper.

After the vehicle was located, the officer described McCollian's reaction to the news, saying McCollian got increasingly "sort of aggressive and defensive on the phone." The officer responded to McCollian and "reminded him that making a false police report is a crime . . ." The prosecutor asked the officer, "Did you feel at that point that you had accused him of anything?" The officer responded, "No. I had not."

To the extent that the officer's reminder can be interpreted as the officer not believing the veracity of McCollian's statement, the error of including this statement was harmless. Once again, evidentiary error is not of constitutional magnitude. "[E]rror is prejudicial only if, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." State v. Kelly, 102 Wn.2d 188, 199, 685 P.2d 564 (1984).

The officer's comment did not materially affect the outcome of the trial in light of all of the other evidence presented as discussed above.

McCollian further contends that this issue is one of prosecutorial misconduct because it is improper for a prosecutor to seek to compel a witness' opinion as to whether another witness is telling the truth. As discussed, the prosecutor did not seek to compel the officer's opinion as to whether McCollian was telling the truth.

Cumulative Error

McCollian asserts that cumulative error should result in remand for retrial. "The accumulation of errors may deny the defendant a fair trial and therefore warrant reversal even where each error standing alone would not." State v. Davis, 175 Wn.2d 287, 345, 290 P.3d 43 (2012). The cumulative error doctrine does not apply where there are few errors which have little, if any, effect on the result of the trial. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). "The defendant bears the burden of proving an accumulation of error of sufficient magnitude that retrial is necessary." State v. Yarbrough, 151 Wn. App. 66, 98, 210 P.3d 1029 (2009). The doctrine does not apply in the absence of prejudicial error. State v. Price, 126 Wn. App. 617, 655, 109 P.3d 27 (2005). For the reasons already discussed, the cumulative error doctrine does not apply.

Offender Score Calculation

McCollian also contends that McCollian's California conviction for possession of a controlled substance should not be included in his offender score in light of Blake, 197 Wn.2d at 170.[5] A prior conviction that is constitutionally invalid on its face may not be included in the offender score. State v. Ammons, 105 Wn.2d 175, 187-188, 713 P.2d 719 (1986). "Out-of-state convictions must be comparable to a valid Washington offence to be included in the calculation of the offender score." State v. Markovich, 19 Wn. App. 2d 157, 173, 492 P.3d 206

---

[5] McCollian also contends that the California conviction was not legally comparable to the Washington State offense and should not have been considered in his offender score calculation for that reason. The State did not concede on this point. However, we need not address this claim because of the State's concession under Blake.

25

(2021). The State agrees that remand for resentencing without the California possession of methamphetamine charge is appropriate. Accordingly, we remand for resentencing.

<u>Imposition of Legal Financial Obligations</u>

The trial court sentenced McCollian to 36 months of community custody. The judgment and sentence indicates that McCollian must "pay supervision fees as determined by" the Department of Corrections (DOC). McCollian contends that the trial court's imposition of community custody supervision fees should be stricken from the judgment and sentence because the court declared McCollian indigent.

RCW 10.01.160(3) provides that the trial court shall not order a defendant to pay costs if a defendant is indigent as defined in RCW 10.101.010(3)(a)-(c). Further, RCW 9.94A.760(1) provides that the trial court cannot order costs as described in RCW 10.01.160 if the defendant is indigent. Community custody supervision fees are not considered costs as contemplated in RCW 10.01.160(3). <u>State v. Spaulding</u>, 15 Wn. App. 2d 526, 537, 476 P.3d 205, 211 (2020). RCW 10.01.160(2) provides, "Costs shall be limited to expenses specially incurred by the state in prosecuting the defendant or in administering the deferred prosecution program under chapter 10.05 RCW or pretrial supervision."

The community custody supervision assessment is imposed under RCW 9.94A.703(2)(d), which states, "Unless waived by the court, as part of any term of community custody, the court shall order an offender to pay supervision fees as

determined by the department." A community custody supervision assessment is not included in the definition of costs.

Because the supervision fees are waivable by the trial court, they are discretionary legal financial obligations (LFOs). State v. Lundstrom, 6 Wn. App. 2d 388, 396 n.3, 429 P.3d 1116 (2018). Nothing prohibits a trial court from exercising its discretion and waiving the supervision fees if the defendant is indigent.

Our Supreme Court has previously discussed the negative impacts of LFOs, including the serious negative consequences on employment, housing, and finances. State v. Blazina, 182 Wn.2d 827, 837, 344 P.3d 680 (2015). Additionally, LFO debt can impact credit ratings, making it difficult to find secure housing. Id. "The barriers that LFOs impose on an offender's reintegration to society are well documented . . . and should not be imposed lightly merely because the legislature has not dictated that judges conduct the same inquiry required for discretionary costs." State v. Clark, 191 Wn. App. 369, 376, 362 P.3d 309 (2015).

However, the trial court never found McCollian indigent. To support his claim of indigency, McCollian cites to an Order of Indigency filed on May 9, 2019, which states, "The court finds that the defendant was previously declared indigent. . ." However, the court did not engage in a colloquy at sentencing to make a determination if McCollian was indigent.

The supervision fees were ordered by the trial court via the form language in the judgment and sentence that required the defendant to pay supervision fees

as determined by DOC.  This form presumes the judge orders the supervision fees.

None of the parties or the trial court made any mention of the community custody supervision fees during sentencing.  We are unable to determine based on this record whether the trial court intentionally imposed the supervision fees and whether McCollian was indigent.  Therefore, we remand for the parties to clarify at resentencing.

CONCLUSION

The trial court properly admitted the victim's text messages as an exception to hearsay under state of mind and present sense impression.  The trial court did not err in denying McCollian's motion for mistrial.  The trial court incorrectly concluded that an ER 404(b) analysis did not apply to the Thomas handgun testimony.  However, any error in failing to conduct a 404(b) analysis and admitting the testimony was harmless.  McCollian failed to show that an officer was questioned about or testified to his personal opinion about McCollian's credibility.  The cumulative error doctrine did not apply.  The parties agree that remand for resentencing is appropriate in light of Blake.  We also remand for the parties to clarify with the trial court if it intended to impose the community custody supervision fees.

Affirm and remand for resentencing.

Coburn, J.

WE CONCUR:

Brennan, J.          Andrus, A.C.J.

28